STATE, Plaintiff-Respondent, v. BOWIE, Defendant-Appellant.

Supreme Court

*No. 77–196–CR. Submitted on·briefs October 10, 1979.— Decided November 6, 1979.*
(Also reported in 284 N.W.2d 613.)

194

For the appellant the cause was submitted on the briefs of *Stephen M. Glynn* and *Shellow & Shellow* of Milwaukee.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general and *Michael R. Klos,* assistant attorney general.

CONNOR T. HANSEN, J.   Bowie was convicted primarily on evidence presented by Michael J. Lake, the victim of the crimes and only eyewitness to the events.

However, his testimony was corroborated in several significant aspects by other state's witnesses.

Although the testimony of Bowie is contrary to that of the victim in many respects, the principal issues in the case are directed toward the introduction of prior crimes evidence for impeachment purposes.

Michael Lake testified that in the early morning hours of January 25, 1975, he was driving his father's blue Cadillac in downtown Milwaukee. He was driving with the window on the driver's side of the car completely open because the heater was on and he did not know how to regulate the heating mechanism. At about 12:15 a.m., Lake was at the corner of Plankinton and Clybourn streets waiting for the traffic light to turn green. Suddenly, he felt something sharp at his throat and heard someone telling him to get out of the car. Lake got out of the car and the defendant asked him for his wallet. When Lake told the defendant that his wallet was locked in the glove compartment, the defendant patted his back pockets to see if the wallet was there, then shoved Lake aside and got into the car. The defendant drove to the intersection of Second and Clybourn streets and toward the freeway.

Lake further testified that after he got out of the car, he saw a knife with an exposed blade four or five inches in length in the defendant's hand. The next day Lake observed a red mark on his neck where the knife had been pressed. His wallet contained $70. He did not give the defendant permission to take the wallet and he did not give the defendant permission to take the car. He let the defendant take the car with the money in it because he was scared for his life.

Lake also testified that his father's car was recovered in Chicago on January 26, 1975. His wallet was returned to him the next day or the following day by a Milwaukee police officer. The physical description on his driver's

license, which was in the wallet, had been altered. His discharge papers, which showed that he had been stationed in Wurstberg, Germany, while serving in the army, had been in his wallet but were missing when the wallet was returned to him.

Lake was taken to Chicago by a Milwaukee police officer on January 26, 1975. While in Chicago, he identified the defendant as his assailant in a police lineup. Lake also identified the defendant in court.

Theodore Lake, Michael Lake's father, testified that on January 25, 1975, his son had his permission to drive his Cadillac. No one else had permission to drive the car. He recovered the car at the Chicago police station. He testified that after midnight on January 25th, he received a phone call from his son, telling him that somebody had robbed him and the car was stolen, and asking him to meet him at the Wisconsin Electric Company. He first heard about the knife when he met his son.

James Hayes, a Chicago police officer, testified that on the evening of January 26, 1975, he stopped a blue Cadillac driven by Percy Bowie. The description on the driver's license produced by Percy Bowie did not correspond with his physical characteristics and he was subsequently arrested. During the investigation regarding Percy Bowie, Hayes received a phone call from someone expressing concern over the driver, Percy Bowie, and the vehicle. The call was from the defendant and he was told that he could take possession of the car if he showed some identification and proof of ownership. In the meantime, the Chicago police contacted Theodore Lake and he informed Officer Hayes that the Cadillac had been taken in a robbery which occurred in Milwaukee and he had not received the car back. When the defendant came to the station he was arrested. The defendant was searched and Michael Lake's driver's license and

wallet were discovered on the defendant. When Officer Hayes looked at the driver's license, he noticed that the physical description had been altered.

Roman Blazer, a detective in the Milwaukee police department, testified that he drove Michael Lake to Chicago on January 26, 1975. Michael Lake indicated to him a mark on his neck. Blazer observed a two inch by one-eighth to one-quarter inch red mark or abrasion on Michael Lake's neck. There were very small scabs on his neck. Michael Lake told Blazer that the defendant had held a knife to his neck, and the mark on his neck was from the knife.

Donald Long, a detective with the Chicago police department, testified that on January 26, 1975, he conducted a lineup, and that Michael Lake positively identified the defendant from the lineup as the individual who robbed him of his automobile and wallet.

The defendant, Kenneth Bowie, testified at the trial. Before he testified, the trial judge, the lawyers and the defendant had a conference outside the presence of the jury and agreed that the defendant had been previously convicted of four crimes. Bowie testified that he was a resident of Chicago, Illinois, and had never lived in Milwaukee, but he had gone to Milwaukee on the night of January 24, 1975, to meet some friends. As he was walking down the sidewalk near the Marc Plaza Hotel after midnight, Michael Lake pulled his car over to the sidewalk, stopped, and waved to the defendant. The defendant walked over to the car and Michael Lake asked him if he knew where he could find a date. The defendant answered in the affirmative because he knew there were prostitutes in the area, so Lake told the defendant to get in the car, and they drove down the street. Lake told him that he had just gotten out of the service and that he had been stationed in Germany. They drove around for about ten minutes and eventually, the de-

fendant directed Lake to pull into a vacant lot. The defendant got out and walked to the corner, telling Lake that he was checking for ladies. Lake got out of the car and wanted to follow him, but Lake also wanted to go back to the car and get his keys. The defendant told him not to worry about it because nobody was out at that time of night. When Lake started to follow him, the defendant ran back to the car, drove onto a side street leading to the freeway, and when he saw Lake coming behind him, he drove onto the freeway ramp and went back to Chicago. He testified that he had no knife in his possession.

The defendant testified that he stopped at a gas station in Chicago and had a friend break the lock on the glove compartment with a knife. The defendant took out the wallet and found $70 in it, which he spent. He testified that at no time during the incident did he threaten Lake or tell him to give him his wallet. He later parked the car at a hotdog stand, wiped off the wallet and threw it back into the glove compartment, and wiped off everything he touched in the car. He stated that he did not have permission to take and drive the car, that he did not have Michael Lake's driver's license on him when he was arrested, and did not know the money was in the glove compartment. The knife used to pry open the glove compartment was not his. The defendant also testified that he went to the police station in Chicago to check on his uncle, Percy Bowie, and that Percy Bowie had used the car and was caught with it.

On cross-examination, the defendant stated that he had been convicted of a crime four times. Additional facts concerning this situation will be set forth later.

Percy Bowie testified that he was the uncle of Kenneth Bowie, and that when the defendant got back early Saturday morning, he told Percy Bowie that he had

borrowed a Cadillac from one of his friends in Milwaukee. Percy Bowie testified that he drove the car Saturday evening, and when the police stopped him and asked him for his license, he produced a license that was not his, so the police searched him, searched the car and told him he was under arrest. They took him to the police station, ran a check on the car and found out the car was stolen. The police called the defendant, and Percy Bowie told him to come down and clear up the situation. The defendant came to the station less than a half hour later.

Following his conviction and the imposition of sentence the defendant, represented by present counsel, proceeded with postconviction motions. An evidentiary hearing was held at which both the defendant and his trial counsel testified.

Thomas Bottoni, defendant's trial counsel, testified he made an investigation of the defendant's criminal record and received a report from the district attorney's office. The document he received was from the Milwaukee Police Department Bureau of Identification and is commonly referred to as a "rap sheet." This document was introduced into evidence and Bottoni stated the criminal convictions listed on the rap sheet:

"A It was reflected that there is an armed robbery pending, the date of the charge being 9–29–76; that there was an attempt robbery of 5–24–73. Disposition appears to be a conviction, three years probation. And on 1–5–74 a criminal trespass charge, one to four years House of Correction, six months consecutive, on charge of one criminal trespass, two, battery, three, resisting, four, contempt, the LFD, I don't know what the charge stands for. At any rate this was the record I have. . . ."

Bottoni asked the defendant about the convictions and testified as follows:

". . . When I asked Mr. Bowie about that record he said, 'Those aren't right,' and I said, 'What do you mean

they are not right?' I said, 'Were you charged with these things?' He said, 'Yes.' 'Were you convicted?' He said, 'Yes.' He said, 'They are not right, they shouldn't be there.' I asked him at that time, 'Were these convictions ever appealed?' The answer to me, as I recall, gave with the feeling it was either a shake of the head or the nod. I didn't pursue the matter any further. I had felt that his answer was in the negative, that they either hadn't been appealed or that these appeals had not been successful. At that point I dropped it and went onto another area of the case."

Bottoni also testified that the defendant told him that he (defendant) had received a letter from the Illinois Appellate Court setting the cases down for another court appearance. However, when Bottoni asked the defendant if he could get the letter, the defendant replied that he did not know where the letter was.

Bottoni testified that he recognized the fact that credibility as between Bowie and the victim was a significant issue in the case.

The defendant testified that Thomas Bottoni was appointed to represent him. During the time that he was in the Milwaukee county jail, Bottoni came to visit him to discuss his case. During the meeting Bottoni went over his rap sheet with him. The defendant testified that the rap sheet reflected a conviction for an attempted robbery, for criminal trespass, for battery, for resisting arrest and for disorderly conduct.

The defendant testified he had a lawyer handling an appeal, but he had not had any conversations with the lawyer. He testified that he subsequently discussed his criminal record with Bottoni at the trial, during the conversation that took place in the judge's chambers. He never stated to the judge or anyone else that the convictions had been reversed. The defendant testified that he was never asked whether these convictions were appealed or whether they were still on his record. He did

not say anything about the fact that these charges had been reversed when the trial judge asked him in chambers whether he had been convicted of armed robbery, criminal trespassing, battery and resisting, because

"*A.* At that time I didn't clearly understand really the intent that I had been convicted of them crimes at that time. I admitted to being convicted but I didn't get a chance really to explain that one of them had been reversed really at the time. I didn't have knowledge of it at that time."

The defendant testified that when he was asked at trial whether he had ever been convicted of a crime, and if so, how many times, he did not understand that if those convictions had been reversed, he was to inform someone that they had been reversed. When asked how many times he had been convicted, he answered "Four times," because he had had the conference in chambers.

Following the evidentiary hearing on the postconviction motions, the trial court reduced the previously imposed 17-year sentence on the armed robbery conviction to 14 years, and the previously imposed sentence on the conviction of operating an automobile without the owner's consent of three years to one year. Judgment of conviction and sentence was entered imposing the sentences as thus modified, and an order was entered denying the motions of the defendant for a new trial.

The issues presented on appeal are:

1. Was the defendant denied due process of law and a fair trial because it was learned after trial that some of his prior convictions had been reversed?

2. Was the defendant denied the effective assistance of counsel?

3. Was the defendant denied a fair trial because of comments offered or questions asked by the trial judge?

After the state presented its case, the defendant Bowie elected to testify. A conference was held in

chambers to determine if any prior convictions could be introduced by the state to impeach the defendant's credibility as a witness. Sec. 906.09(3), Stats. The defendant and his trial counsel were present. The prior criminal record of the defendant was extensively reviewed, with the defendant participating in the review. It was determined that certain of his prior convictions, such as disorderly conduct and contempt, were not to be considered as impeachment evidence. It was ultimately agreed that the defendant had four prior convictions: attempted armed robbery, criminal trespass to a building, battery and resisting an officer; and that, if asked, he could testify that he had previously been convicted four times. After trial it was learned that the last three of the above-mentioned convictions had been reversed. [1]

During the trial the defendant was asked how many times he had been convicted of a crime and he responded that he had been convicted four times.

At the conclusion of the trial, when instructing the jury in regard to the prior convictions of the defendant, the trial court did not mention the number of prior convictions and instructed the jury as follows:

"Evidence has been received to the effect that the defendant has heretofore been convicted of crimes. This evidence was received solely because it bears upon the credibility of the defendant as a witness, and the fact of conviction is one that you may take into consideration in weighing his testimony and in determining his credibility. It must not be used for any other purpose, and particularly, you should bear in mind that the conviction of a defendant of crimes at some previous time is no proof that he is guilty of the offense with which he is now charged."

Sec. 906.09, Stats., provides that evidence that a witness has been convicted of a crime is admissible for the

---

[1] See: People v. Bowie, 36 Ill. App.3d 177, 343 N.E.2d 713 (1976).

purpose of attacking the credibility of the witness. In *Nicholas v. State,* 49 Wis.2d 683, 688, 183 N.W.2d 11 (1971), this court expressed the rationale for allowing evidence of prior criminal convictions to impeach a witness:

"The fact of prior convictions and the number thereof is relevant evidence because the law in Wisconsin presumes that one who has been convicted of a crime is less likely to be a truthful witness than one who has not been convicted. In addition, the number of prior convictions is also held to be relevant evidence on the issue of credibility because the more often one has been convicted, the less truthful he is presumed to be. *Liphford v. State* (1969), 43 Wis.2d 367, 168 N.W.2d 549. . . ."

And this court has held that a person who has been convicted eleven times previously is considerably less credible than a person who has been convicted only once. *Liphford v. State,* 43 Wis.2d 367, 371, 168 N.W.2d 549 (1969).

This court has stated, however, that a conviction which has been reversed or set aside may not be used to impeach a witness at a criminal trial. *Benedict v. State,* 190 Wis. 266, 272, 208 N.W. 934 (1926). *See also: Thomas v. United States,* 121 F.2d 905, 907 (D.C. Cir. 1941).

Bowie contends that the trial court deprived him of a fair trial and due process of law because he testified that he had more than one prior conviction.

The use of prior convictions for impeachment purposes is subject to constitutional guarantees requiring a fair trial and due process. *State v. Driscoll,* 53 Wis.2d 699, 709, 193 N.W.2d 851 (1972). The record shows, however, that Bowie, his lawyer, and the prosecution agreed that Bowie would testify to four prior convictions. The

record is also clear that neither Bowie nor his lawyer advised the trial court that three of the convictions had been reversed by an Illinois appellate court. Bowie did not object to the admission of the three prior convictions at trial and did not object when the assistant district attorney stated in his closing argument that Bowie testified that he had committed four crimes. Bowie did not raise any objection to the admission of the three prior convictions until he moved for a new trial.

In *Kwosek v. State,* 60 Wis.2d 276, 208 N.W.2d 308 (1973), the defendant was found guilty of false imprisonment and of endangering safety of another by conduct regardless of life. Motions after verdict on the grounds of alleged error and for a new trial were denied. On appeal, the defendant contended that the trial court erred in admitting into evidence references to the fact that he had been convicted of second-degree murder, and that such references denied him a fair trial. The testimony and closing arguments which referred to his conviction for murder were not objected to. This court held that any objection to the admissibility of evidence of prior convictions was waived. Accordingly, we conclude that Bowie has waived his right to object to the admission of evidence of prior convictions which were reversed.

Furthermore, if we were to assume it was error in this case to admit the testimony of the three prior convictions into evidence, it was not reversible error under any standards nor does it reach error of constitutional proportions. The effect of any erroneously admitted statement, which carries no reversal as a matter of law, must be realistically evaluated in the context of the case. *Wold v. State,* 57 Wis.2d 344, 204 N.W.2d 482 (1973). "Errors committed at trial should not overturn the conviction unless it appears the result might probably have

been more favorable to the party complaining had the error not occurred." *Hart v. State,* 75 Wis.2d 371, 394, 249 N.W.2d 810 (1977).

There was substantial credible evidence against the defendant, and in support of the verdict, Michael Lake testified that Bowie approached his car when it was stopped and pressed a knife against his throat through the open car window. Bowie ordered Lake out of his car and asked Lake for his wallet. When Bowie was told that the wallet was locked in the glove compartment of the car, he checked Lake's pockets to see if the wallet was there, then shoved Lake aside, got into the car and drove away toward the freeway to Chicago. Lake's testimony was corroborated by other state witnesses. Officer Hayes testified that Bowie was arrested in Chicago when he came to the police station to claim Lake's car, and that Lake's wallet and driver's license were discovered on Bowie. Officer Long testified that Lake identified Bowie in a lineup conducted in Chicago the day following the crime. And another police officer testified that he observed a red mark or abrasion approximately two inches in length on Lake's neck the day following the crime, and was told by Lake that this was the place where the knife had been pressed against his neck. Percy Bowie testified that the defendant told him a friend of his in Milwaukee had loaned him the car.

Furthermore, since Bowie had been previously convicted of attempted armed robbery and the conviction remained of record and unreversed, he would have had to acknowledge that conviction. The jury would have received the standard instruction on impeachment by prior convictions which was given in this case. In addition, the standard jury instruction does not direct the jury to give the number of convictions special consideration, although the number of prior convictions is admissible evidence.

From an examination of the record in this case, the evidence affords no room for a reasonable doubt and no reasonable jury could fairly have come to any other conclusion.

Bowie next contends that he was denied the effective assistance of counsel because his trial counsel, Bottoni, failed to investigate in order to determine whether some of his convictions has been reversed.

The standard for competency of counsel was set forth in *State v. Harper*, 57 Wis.2d 543, 557, 205 N.W.2d 1 (1973):

"... Effective representation is not to be equated, as some accused believe, with a not-guilty verdict. But the representation must be equal to that which the ordinarily prudent lawyer, skilled and versed in criminal law, would give to clients who had privately retained his services...."

In that case, the court adopted certain standards of the American Bar Association relating to criminal justice as partial guidelines to the determination of effective representation, but cautioned that "... we do not hold that a violation thereof automatically determines incompetency or ineffectiveness of the representation ..." *Id.* at 557. One of these standards which was adopted is sec. 4.1, *Standards Relating to the Prosecution Function and the Defense Function*, which provides:

"4.1 **Duty to investigate.**
"It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty."

Bowie seems to contend that his defense counsel violated this standard in that he did not explore all avenues leading to facts relevant to penalty. Bowie now claims that although his trial counsel had a copy of his criminal record, he never attempted to verify the record in spite of the fact that credibility was an issue in the case.

However, the record shows that Bowie and his defense counsel discussed Bowie's rap sheet which listed his prior criminal convictions. Bowie testified at the evidentiary hearing on the motion for a new trial that he informed his defense counsel of the following facts:

"*A.* Basically when he asked me about my prior record he asked me did I have anything on appeal or any other thing some other type of way, you understand, that was still on file, in which at that time I told him, he asked me was I ever been convicted. I told him 'I have been convicted,' and that I was supposed to appear in court on October 2, 1976 on a reversal decision. I received a letter through the mail about the case, the opinion on the trespassing, that's all the information I got back at that time on that case, which he didn't really know everything, any details to go into at that time."

Bowie also testified that he received the letter in May, 1976, and the letter informed him that the Illinois Appellate Court was setting a date for review of the case. He stated that he did not have the letter in his possession when he conferred with his defense counsel and that he did not know where the letter was.

Bottoni testified that he and Bowie discussed Bowie's rap sheet which listed his prior criminal convictions. When Bottoni asked Bowie if any of those convictions had been appealed, Bowie responded with a movement of his head which Bottoni interpreted as a negative answer, so he did not pursue the matter further. Bottoni also testified that he was informed about a letter setting certain cases in Illinois down for another court appearance, but

when Bottoni asked Bowie if he could get the letter, Bowie replied that he did not know where it was.

Based on this record, Bowie does not present a meritorious argument that he was denied the effective assistance of counsel. There is no evidence in the record that Bowie told Bottoni that any conviction was reversed or that the the hearing scheduled in Illinois related to a conviction which appeared on Bowie's rap sheet. The fact that his defense counsel relied upon Bowie's acknowledgment that none of the convictions appearing on his rap sheet had been reversed is not grounds to support an argument that Bowie was denied effective assistance of counsel.

Finally, Bowie contends he was denied a fair trial because of questions asked by the trial judge during trial which were designed to clarify or elicit testimony favorable to the prosecution. Our attention is directed to several instances in the record which he claims support this assertion.

We have examined the record and, in particular, considered those instances pointed out by appeal counsel. We are of the opinion that none of the questions propounded by the trial judge were prejudicial to the cause of the defendant.

This court has stated that it is reluctant to hold that the trial court's involvement in the elicitation of tesimony during a trial resulted in such prejudice as to require a new trial. *Schultz v. State,* 82 Wis.2d 737, 742, 264 N.W. 2d 245 (1978). In *State v. Nutley,* 24 Wis.2d 527, 562, 129 N.W.2d 155 (1964), this court set forth the standard for determining whether the conduct of a trial judge was such as to deny a fair trial:

". . . a trial court may question a witness called by the parties in order to clarify received testimony, providing

the court does not overtly express his view of the matters in issue. While the court cannot function as a partisan, it may take necessary steps to aid in the discovery of truth. . . ."

*See also: Flowers v. State,* 43 Wis.2d 352, 365, 168 N.W. 2d 843 (1969) ; *Lemerond v. State,* 44 Wis.2d 158, 164, 170 N.W.2d 700 (1969) ; *State v. Bergenthal,* 47 Wis.2d 668, 680, 178 N.W.2d 16 (1970) ; *Lewis v. State,* 57 Wis. 2d 469, 474, 204 N.W.2d 527 (1973) ; *State v. Amundson,* 69 Wis.2d 554, 566, 230 N.W.2d 775 (1975). This court has also stated that:

". . . the trial judge is more than a mere referee. The judge does have a right to clarify questions and answers and make inquiries where obvious important evidentiary matters are ignored or inadequately covered on behalf of the defendant and the state. A judge does have some obligation to see to it that justice is done but must do so carefully and in an impartial manner. . . ." *State v. Asfoor,* 75 Wis.2d 411, 437, 249 N.W.2d 529 (1977).

The questions posed by the trial court in the instant case were designed to clarify testimony and expedite the trial and do not disclose any partiality on the part of the trial court. From our examination of the record, we conclude the defendant was not denied the right to a fair trial because of any alleged participation by the trial court in the trial.

Furthermore, the trial court gave the standard instruction to the jury to disregard any impression of the judge's opinion as to the guilt or innocence of the defendant which they might draw from his participation in the trial. The court instructed the jury as follows:

"If during the trial of this case I have given to any Member of the Jury and in the course of giving these instructions I may give to any Member of the Jury an impression of my opinion concerning the guilt or innocence of the defendant, I charge you to disregard such impression entirely and decide the issues of fact in this case

solely as you view the evidence. You, the jury, are the judges of the facts, and the Court is the Judge of the law only."

This court has frequently said that possible prejudice to a defendant is presumptively erased from the jury's collective mind when admonitory instructions have been given by the court. *Roehl v. State,* 77 Wis.2d 398, 413, 253 N.W.2d 210 (1977). *See also: State v. Sarinske,* 91 Wis.2d 14, 35, 280 N.W.2d 725 (1979). Thus, on the basis of this record, the conduct of the trial judge had no prejudicial effect on the jury, and the defendant was not denied his right to a fair and impartial trial.

*By the Court.*—Judgment and order affirmed.