STATE of Wisconsin, Plaintiff-Respondent,

v.

Douglas J. FEELA and Maurice Sabin, Defendants-Appellants.†

Court of Appeals

*No. 80–841–CR. Argued January 16, 1981.—Decided February 24, 1981.*
(Also reported in 304 N.W.2d 152.)

† Petition to review denied.

250

For the defendants-appellants there was a brief by *Michael Yovovich,* assistant state public defender, and oral argument by *Michael Yovovich,* assistant state public defender.

For the plaintiff-respondent there was a brief by *Bronson C. La Follette,* attorney general, and *Betty R. Brown,* assistant attorney general, and oral argument by *Betty R. Brown,* assistant attorney general.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

DYKMAN, J.   Defendants appeal from judgments of conviction of three crimes: armed robbery while masked as a party to the crime, contrary to secs. 943.32(1) and (2), 946.62 and 939.05, Stats.; attempted first-degree murder while masked as a party to the crime, contrary to secs. 940.01(1), 939.32(1), 946.62, and 939.05, Stats.; and conspiracy to commit masked armed robbery, contrary to secs. 939.31, 943.32(1) and (2), and 946.62, Stats. Defendants also appeal from an order denying their post-conviction motions.

Much of the state's case was based on the testimony of Maurice Sabin's son, Jerry Sabin. Jerry indicated that he had been released from a juvenile institution on parole in December of 1978, and went to live with his father. He testified that he was living at his father's

house on January 25, 1979, when Feela arrived in a van. Jerry stated that on the morning of Feela's arrival, Jerry, his father, Feela, and Dale Patchen formulated and discussed a plan to rob a bank in Bancroft. According to the plan, the men would steal a car and park it near the bank. Feela and Patchen would dress in old clothes and ski masks, enter the bank armed with handguns, execute the robbery and flee with the money in the stolen car. Jerry would drive a separate car parked a block or two from the bank, accompanied by Maurice who would scare the police away with a rifle. The four men drove to the bank later that day to "see how it looked." They discussed their plan further at that time.

Jerry testified that the four men discussed the bank robbery again the next day. Maurice suggested stealing a car from another county. The men drove to Stevens Point to locate a car, but could not find one they deemed suitable. They went to another town, but were again unable to find a car they wished to steal. They left that town as it was getting dark and drove to Waupaca where they spotted a van in a parking lot. Jerry testified that Feela hot-wired the van. The van was driven to Bancroft and parked on a back road outside of town. The four men then drove to the bank in Maurice's car, determined that it was too crowded to rob, decided that the money was probably locked in the safe anyway (it was by then about 8:00 p.m.), and returned to Maurice's home. The men left the van where it was parked.

The men returned to the van the next day. Patchen and Feela changed clothes and drove the van to the bank. The Sabins followed in Maurice's car. As the Sabins parked and waited, they saw the van circle the bank once and leave town. The Sabins followed. The four men stopped on a back road outside of town. Patchen and Feela explained that they did not go ahead with the robbery because they "didn't like the situation." The van was driven into a ditch and abandoned.

The four men then drove to a tavern where they spent the afternoon. After a few hours, Jerry went out to the car to lie down. When the remaining men returned to the car, they drove to Wisconsin Rapids. Jerry testified that he heard someone say "this is it." At that point Feela got out of the car wearing a ski mask and stuck a gun in his pocket. Someone said that they would pick Feela up a couple of blocks away. Jerry continued to lie down while the car drove slowly. He testified that he heard someone say "he is out now." He heard a shot and someone said that Feela was being chased. The three men in the car then left town, leaving Feela.

Two employees of Gene's Bottle House, a liquor store in Wisconsin Rapids, testified that an armed masked man entered the store on January 27, 1979, and told them to fill some plastic bags with money. An employee placed some money in a bag and started to close the cash register. The robber reached into the till before she closed it and grabbed the remaining money. The robber then left the store.

Two other witnesses testified that they saw a man standing by the back door of the liquor store pulling on a ski mask. The man was carrying a gun as he entered Gene's Bottle House. The witnesses stopped at a neighboring gas station where they instructed an attendant to call the police. They then drove to Gene's, where they picked up one of the liquor store employees who was attempting to follow the robber. The witnesses lost sight of the robber and drove around the area trying to locate him.

Two attendants at the neighboring gas station and a friend of theirs saw the robber leaving the liquor store and ran after him. They testified that after chasing him to the edge of the parking lot, the robber pointed his gun at the attendant closest to him, Jeffrey Flick. They testified that the robber said: "Stop. Get out of here. Turn around and run fast. I will shoot." All three tes-

tified that with the barrel of the gun pointed at Flick, the robber fired a shot. The robber then ran away.

The two witnesses and the store employee in the car saw the robber being pursued by the gas station attendants. The employee left the car to phone the police. The two remaining witnesses drove away and found a police officer to whom they told their story. Shortly thereafter, they spotted the robber walking down the street. As they tried to hail another police officer, the robber lay down between two snowbanks. When an officer stopped, the robber stood, ran across the street, and disappeared into the trees.

Police officers testified that they followed footprints in the snow that led to a doorway in a house. They determined that the door was the entrance to a basement. The police entered a second door to the basement and called "come out." At first there was no response. The officers then identified themselves as the police, and heard a man say "How do I know you are police?" An officer threw his hat into the basement for identification. At that point, Feela emerged from the basement. The officers searched the basement and found a vest, gloves, and a handgun hidden there.

The various witnesses identified the gun as that used by the robber, and the vest and gloves as those worn by him. They further identified the shirt and boots that Feela was wearing when apprehended as those worn by the robber.

Feela presented an alibi as his defense. He testified that he had been working in Anoka, Minnesota through January 26, 1979. He stated that he decided to go to Wisconsin Rapids on January 27 to collect a debt. He drove his van to Coon Rapids, where it broke down. He left the van in Coon Rapids, but met a friend there who agreed to give him a ride to Wisconsin Rapids. Feela was let out of the car at the edge of Wisconsin Rapids

and went to a bar to call the man who owed him money. The person who answered the phone indicated that the individual Feela sought was no longer in Wisconsin Rapids. Feela then started walking into town. He testified that as he was walking, someone stuck a gun in his neck and made him take off his coat. The man then handed him something and hit him in the chest and told him to run. Feela took a couple of steps and dropped down on the sidewalk. He then heard a shot and saw snow flying, so he got up and ran. He hid in the basement where the police found him. Because he was afraid that someone was shooting at him, he demanded identification so that he was sure that the police were upstairs. He testified that the vest, gloves and gun had been handed him by his assailant, and that he just dropped them into something to get rid of them.

Feela presented the testimony of his fiancee and her father to corroborate that he was in Anoka until January 27. A police officer testified that Feela's van was found in a parking lot in Coon Rapids on January 30, 1979.

Maurice Sabin also presented an alibi defense. He testified that the last time he saw Jerry before the robbery was January 22, 1979. He further testified that he spent the day home alone on January 25, and watched television with his wife and neighbors that evening. He indicated that he was home alone again on January 26. He stated he was home with his wife on the morning of January 27, but went to some taverns in the afternoon, where he borrowed $10 from someone he knew. On his way home from the taverns he stopped at a friend's house and made a phone call, then proceeded home. When he arrived home, Jerry called and asked to be picked up. Maurice did so and again returned home. Feela called later that night from the Wood County Jail. Portions of Maurice's alibi were corroborated by witnesses called on his behalf. The state attempted to impeach the testimony

of some of these witnesses, and introduced evidence on rebuttal to contradict parts of Maurice's testimony.

Both defendants were charged with theft, sec. 943.20, Stats., and car theft, sec. 943.23(1), Stats., in Waupaca County. At trial, the state attempted to prove that the defendants, as parties to the crime, stole the van which was to be used in the Bancroft bank robbery. The defendants were acquitted on both counts.

The trial which resulted in this appeal was held the week of August 14, 1979. Both defendants were convicted of conspiracy to rob the Bancroft bank, armed robbery of the liquor store, and attempted murder. They raise the following issues for our consideration:

(1) Does the doctrine of collateral estoppel bar the use of evidence that defendants stole a van, an offense for which they were acquitted, in a subsequent prosecution for conspiracy to commit armed robbery?

(2) Is reversal required by the state's allusions to and comments on Feela's post-arrest silence?

(3) Was the evidence presented at trial sufficient to establish the guilt of Maurice Sabin as a party to the crime of attempted murder?

(1) *Collateral Estoppel*

Prior to trial, defendants moved to suppress any evidence of the Waupaca County van theft for which they had been acquitted. The court ruled that testimony regarding the theft of the van would be permitted, but that the fact of the trial and the resulting acquittal would be excluded from evidence.

Defendants argue that failure to suppress the evidence of the van theft violated the doctrine of collateral estoppel as developed in *Ashe v. Swenson,* 397 U.S. 436 (1970). *Ashe* involved an armed robbery of six poker players committed by three or four men. The state prosecuted Ashe for the robbery of one of the poker players. Four of the poker players were called as witnesses by

the state. Two thought that there had only been three robbers and could not identify Ashe as one of them. A third could not identify Ashe but said his voice sounded like one of the robbers'. The fourth identified Ashe, but only by his size, height, and actions. On the basis of this evidence, Ashe was acquitted.

Six weeks later, Ashe was prosecuted for the robbery of another of the six poker players. At this trial the witnesses were more firm in their identifications, and Ashe was convicted. In reversing the conviction, the Supreme Court held that the second prosecution was barred by the doctrine of collateral estoppel. The Court's definition of collateral estoppel was "simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443. The Court held that the doctrine of collateral estoppel is embodied in the fifth amendment guarantee against double jeopardy. *Ashe*, 397 U.S. at 445. Applying the doctrine to the facts of the case before it, the Court held that the first trial determined as an ultimate issue of fact that Ashe was not one of the three of four men who robbed the poker players, and that the issue could not be relitigated in a second trial.

The facts and holding of *Ashe, supra,* make clear that an ultimate issue of fact necessarily determined in one trial may not be relitigated as an ultimate issue of fact in a second trial.[1] It was determined as an ultimate

---

[1] The state argues that it is "extremely doubtful that the doctrine of collateral estoppel now even applies to criminal cases." In support of this proposition, the state cites *Standefer v. United States*, 447 U.S. 10, 100 S. Ct. 1999 (1980). *Standefer* does not abrogate the doctrine of collateral estoppel. *Standefer* held that a defendant who aids and abets can be convicted although the principal in the same crime was earlier acquitted. The opinion rejects the doctrine of *nonmutual* collateral estoppel in criminal

issue of fact in the Waupaca County trial that defendants did not steal the van. That issue was not, however, relitigated as an ultimate issue of fact in the second trial. The fact that defendants acquired a van for the purpose of robbing a bank is one of many overt acts which the state attempted to prove the defendants undertook in furtherance of their conspiracy. Proof of the manner in which the van was acquired was irrelevant to the state's purpose. It was not essential to the state's case to show that the van had been stolen, and the fact of the theft was thus not an ultimate fact—although it was an evidentiary fact—in the conspiracy trial.

The definition of collateral estoppel provided by the Court in *Ashe* leaves open the question of whether an ultimate issue of fact determined in a trial may be relitigated as an evidentiary fact in the subsequent trial. Defendants contend that the doctrine is equally applicable whether the fact sought to be relitigated is ultimate or evidentiary.[2]

Defendants rely on a line of cases which include *United States v. Keller,* 624 F.2d 1154 (3d Cir. 1980) ; *United*

cases, but does not extend its holding to mutual collateral estoppel. The doctrine of mutual collateral estoppel has been an established principle of federal criminal law since 1916, *see Hebel v. State,* 60 Wis.2d 325, 328, 210 N.W.2d 695, 697–98 (1973), and was incorporated into the double jeopardy clause as recently as 1970 by virtue of *Ashe, supra.* If the supreme court were to overrule this longstanding doctrine altogether, we believe it would do so explicitly.

[2] Distinctions of the sort we discuss in this case have caused more than one court to complain that collateral estoppel is "a slippery concept indeed." *United States v. Mock,* 604 F.2d 341, 343 (5th Cir. 1979). As the court stated in *United States v. Larkin,* 605 F.2d 1360, 1361 (5th Cir. 1979), cert. den. 446 U.S. 939 (1980) : "This case involving the arcane principles of double jeopardy and collateral estoppel is not susceptible of bright-letter law or black-letter law; the areas are most often gray, and dimly to be seen. Needless to say, one entering this field must do so with trepidation."

*States v. Mock,* 604 F.2d 341 (5th Cir. 1979); *United States v. Mespoulede,* 597 F.2d 329 (2d Cir. 1979); and *Wingate v. Wainwright,* 464 F.2d 209 (5th Cir. 1972). In *Keller,* the defendant used an entrapment defense against the charge that he had conspired to distribute a controlled substance. The government attempted to undermine the defense by introducing evidence that the defendant had been engaged in other drug distribution schemes. Some of the transactions referred to by the government had been the basis of prior prosecutions in which the defendant had been acquitted. The court held that it was error to allow the evidentiary use of these prior offenses even though the offenses involved different transactions and did not establish an ultimate fact in the subsequent proceeding. *Keller,* 624 F.2d at 1158–60. Although the decision was based on collateral estoppel, the court made clear that it was deciding the case on a rule of evidence and not on constitutional grounds. *Keller,* 624 F.2d at 1159–60.

In *Mock, supra,* the defendant was acquitted of conspiracy to import and distribute marijuana. In his subsequent trial for tax evasion, the government introduced the same facts it had presented at the conspiracy trial to show that the defendant had received unreported income from the sale of marijuana. The court held that facts "established in the first trial may not be used in the second trial either as ultimate or as evidentiary facts" and accordingly reversed the conviction. *Mock,* 604 F.2d at 343. The court came to the same conclusion in *Wingate, supra,* where evidence of prior robberies for which the defendant had been acquitted was introduced to show a course of conduct in a prosecution for a subsequent robbery. The court interpreted *Ashe, supra,* to stand for the proposition that there was no difference between an ultimate fact and an evidentiary fact for the purpose of collateral estoppel analysis. *Wingate,* 464 F.2d at 213.

In *Mespoulede, supra,* the defendant was tried for possession of and conspiracy to distribute a controlled substance. He was acquitted of possession and a mistrial was declared on the conspiracy charge. Evidence pertaining to the defendant's possession of the controlled substance was introduced at the subsequent retrial of the conspiracy charge. Using a due process analysis, the court held that "collateral estoppel was applicable even if the issue decided in the first trial was not essential to a conviction for conspiracy." *Mespoulede,* 597 F.2d at 334. The court concluded that "it places an unjust burden on a defendant to require him to relitigate the very issue a jury decided in his favor." *Mespoulede,* 597 F.2d at 334.

In a second line of cases, courts have refused to interpret *Ashe, supra,* to bar relitigation of a fact which is merely evidentiary, and not essential to conviction, in a subsequent trial.[3] *See, e.g., United States v. Clark,* 613 F.2d 391 (2d Cir. 1979) ; *Oliphant v. Koehler,* 594 F.2d 547 (6th Cir. 1979), *cert den.* 444 U.S. 877 (1979) ; *United States v. Kills Plenty,* 466 F.2d 240 (8th Cir. 1972), *cert den.* 410 U.S. 916 (1973) ; *United States v. Keine,* 436 F.2d 850 (10th Cir. 1971), *cert den.* 402 U.S. 930 (1971). We find the reasoning behind these decisions to be persuasive when applied to the facts of this case.

---

[3] The state places great reliance on *Douthit v. Estelle,* 540 F.2d 800 (5th Cir 1976), as one of these cases. The defendant in *Douthit* transported a woman to three different counties and allegedly raped her in each. Defendant was acquitted of rape in one county, but convicted in a second. The court rejected the argument that collateral estoppel barred the second prosecution, since the victim may have consented to intercourse in the first county but not the second. The issue of the victim's consent necessarily posed a new question in each county. The position of the fifth circuit on the issue presented to us for decision is more accurately reflected in *Wingate, supra,* and *Mock, supra.*

The protections afforded by the double jeopardy clause, and thus by the doctrine of collateral estoppel as incorporated within it, include protection against a reprosecution for an offense after either acquittal or conviction, and protection against multiple punishments for the same offense. *State v. Bowden,* 93 Wis.2d 574, 580, 288 N.W. 2d 139, 141 (1980). A natural extension of these protections is that an ultimate fact determined in one prosecution should not be relitigated as an ultimate fact in a subsequent prosecution. If it has once been established that a defendant did not commit an element of a crime, the defendant should not be required to relitigate that issue when the issue is essential to proof of an offense in a subsequent trial. The policies which deny relitigation under these circumstances, however, do not apply when the issue to be relitigated is not essential to the second prosecution.

A literal reading of the Court's language [in *Ashe*] . . . might suggest that an ultimate fact in the first proceeding—such as a determination that defendant had not robbed another party—might be inadmissible in a second action, even if that fact were only an "evidentiary" or "mediate" fact in the latter case. Such an interpretation, however, would not be consistent with the recognized concept of double jeopardy, since that doctrine traditionally has been applied to a subsequent prosecution for a previously litigated offense, and has not been extended to bar the admission of a previously litigated issue at a trial involving a different offense. Note, *Expanding Double Jeopardy: Collateral Estoppel and the Evidentiary Use of Prior Crimes of Which the Defendant Has Been Acquitted,* 2 Fla. State U.L. Rev. 511, 519–20 (1974).

The Supreme Court refused to extend collateral estoppel to bar use of a previously litigated issue as an evidentiary fact in *Yates v. United States,* 354 U.S. 298, 337–38 (1957):

We think, however, that the doctrine of collateral estoppel does not establish any such concept of "conclusive evidence" as that contended for by petitioner. The normal rule is that a prior judgment need be given no conclusive effect at all unless it establishes one of the ultimate facts in issue in the subsequent proceeding. So far as merely evidentiary or "mediate" facts are concerned, the doctrine of collateral estoppel is inoperative.

Consideration of the policies underlying the doctrine of collateral estoppel as applied in the criminal setting leads us to reject defendant's contention. *See also Standefer v. United States,* 447 U.S. 10, 24, 100 S. Ct. 1999, 2007–08 (1980) (nature of criminal prosecution makes application of doctrine of nonmutual collateral estoppel inappropriate. We hold that the doctrine does not bar the use of a previously litigated issue as an evidentiary fact in a subsequent trial.

We also reject defendant's contention, based on *Mespoulede, supra,* that the relitigation of an established ultimate issue of fact, whether relitigated as an evidentiary or an ultimate fact, violates due process. The facts here are significantly different from those present in *Mespoulede.* In this case, the state merely introduced evidence that defendants, with their two co-conspirators, acquired a van to aid them in robbing a bank. The method by which they acquired the van was not a significant part of the state's case; the evidence was simply introduced as a link in a chain of events which the prosecutor sought to establish. The defense was free to refute the facts as presented by the state. This is not a case where, as in *Mespoulede,* the two crimes are intimately related, so that proof of one strongly implicates the defendant in the other. Nor is this a case where evidence of other crimes for which a defendant has been acquitted is introduced to establish a pattern of behavior. *See, e.g.,*

*Blackburn v. Cross,* 510 F.2d 1014 (5th Cir. 1975); *Wingate, supra.*

■

Defendants next assert that their right to present a defense was violated by the judge's order excluding evidence of their acquittal in Waupaca County. In support of this proposition, defendants cite *Chambers v. Mississippi,* 410 U.S. 284 (1973). *Chambers* stands for the proposition that a state may not use its rules of evidence in such an unduly restrictive fashion that a defendant is denied his fundamental rights to cross-examine, confront witnesses, and present witnesses in his own behalf. That is not the case here. Defendants were free to cross-examine the state's witnesses and introduce their own witnesses to refute any allegations made by the state.

■

The court's ruling that the previous trial and acquittal should be excluded from evidence was based on a determination that the evidence was not relevant. Defendants argue that the fact of their acquittal makes the allegation of theft of the van less probable, and that the acquittal is therefore relevant. Sec. 904.01, Stats. We do not agree with this contention.[4] The evidence presented to the two juries was the same in both trials. Different juries may draw different conclusions from

---

[4] The analysis employed by the supreme court in *Barrera v. State,* 99 Wis.2d 269, 278–81, 298 N.W.2d 820, 824–25 (1980), demonstrates that, although the trial court has discretion to weigh the probative value of evidence against its prejudicial effect, the initial determination of whether evidence is relevant is a question of law. Language to the contrary in *State v. Lederer,* 99 Wis.2d 430, 444, 299 N.W.2d 457, 465 (Ct. App. 1980), and *State v. Phillips,* 99 Wis.2d 46, 55, 298 N.W.2d 239, 243 (Ct. App. 1980), is necessarily overruled by *Barrera.* "When the trial court rules on a question of law, our review is independent and we are not bound by the trial court's decision." *Johnson v. K-Mart Enterprises, Inc.,* 98 Wis.2d 533, 539, 297 N.W.2d 74, 77 (Ct. App. 1980).

the same facts. *See Roth v. United States,* 354 U.S. 476, 492 n. 30 (1957). A court cannot peer into a jury's collective mind to determine the basis upon which its conclusions are founded. We cannot know why the jury in the Waupaca County trial acquitted defendants. We know only that it formed the opinion that the state did not meet its burden of proving that defendants stole the van. That opinion is binding for the purposes of double jeopardy. A jury's *opinion,* however, is not a *fact* which in itself makes defendants' complicity in the theft either more or less likely. We hold that as a matter of law, evidence of an acquittal of the crime of car theft is not relevant to a trial for conspiracy to rob a bank, any more than would be evidence of conviction of that crime, particularly when the state merely sought to prove that defendants acquired the van as one event in a long series of events taken in furtherance of the conspiracy.

(2) *Comment on Silence*

Feela contends that the state impermissibly elicited testimony that he failed to provide the police with his alibi at the time of his arrest, and that the prosecutor impermissibly commented on his silence during closing arguments. The testimony to which Feela objects is as follows:[5]

[5] Feela also objects to the following testimony of Officer Gardner brought out on direct examination by the state:

Q  Did you advise him of his rights?
A  Yes, we did.
Q  And what was your conversation?
A  Basically after being advised of his rights, he indicated he didn't wish to have an attorney present at that time. I then attempted to learn how he got to the City of Wisconsin Rapids.
Q  And what did he say?
A  And at that point he said he hitchhiked.
Q  He say when?

Q Mr. Feela, when you were picked up, did you indicate what had happened to your parka?

A When I was picked up?

Q Right, by the police.

A What do you mean, who did I indicate it to?

Q Did you indicate it to anybody?

A I can't say for sure if I did or didn't. I mean I said, I said a couple things that, the fact of being shot at, something was taken from me; I don't know if I said my coat was or not. I don't know.

. . . .

Q So you never saw him again?

A Whoever it was, no. If I had known somebody I was supposed to be looking for, maybe I would have known—I would have seen him.

Q This is the first time you have indicated this to Wood County Authorities, is that correct?

A What are you talking about?

Q This whole, from the point on that somebody put something in your arms, that you had put the gun in a

A Well, he had indicated that, I don't recall exactly what he said about it; said he had a couple beers and something like this; and then I said: "You did this in your shirt sleeves?"

Q And what happened next?

A At that point he says: "Am I being charged with something?" And I advised him then that he was.

Q Did you have any further conversation with him?

A Other than the fact he said he felt he better have some assistance, and he made a phone call.

Q All right, were you present when he made the phone call?

A Yes.

Q Did you have any conversation with him regarding that?

A Other than the fact he indicated this to the subject that he called, and he said it was Maurice Sabin.

We find nothing improper in this examination. The state did not elicit the fact that Feela exercised his right to remain silent. The testimony merely establishes that Gardner had no further conversation with Feela after he informed Feela that he was charged with a crime. There is no indication that Gardner attempted to ask further questions and that Feela refused to answer them. We therefore conclude that nothing in this testimony can be said to be prejudicial to Feela.

bag, that you put some other stuff and you didn't know what it was, you put it in something; that's the first time, is that right?

A If I can recall, yes, because when I made another statement, nobody believed me so—

Q How much of the statement did you give?

A To the fact that I was shot at; and nobody asked me who shot at me; nobody asked me—they just hauled me off in front of a bunch of cops and away I went.

Q And you didn't say anything more?

A I didn't really have much choice to any anything.

Q Didn't they want to ask you some questions?

A Later on that evening. See, I think it was Jere Gardner by that time; I didn't know who he was. I have met him a few times since then, and I think a guy by the name of Moen, another police officer, I think that's who was there, I'm not positive.

Q But you didn't tell this to them?

A No, because they made kind of wise remarks why wasn't I cold walking down here in my shirtsleeves. Just the way of their attitude, the way they were talking; I said I wanted a lawyer or legal advice, whatever, I said.

Q You hadn't told them you lost your parka, had you?

A I can't recall.

The comment made by the prosecutor during closing arguments which defendant finds objectionable was this:

Now Mr. Gardner testifies that they asked him how he got there, and he said he was hitchhiking; and he said the shirt sleeves—and then suddenly, we don't hear this story. We are not told of all of this; that I have got alibi witnesses; that I have got no reason to fear because a mysterious man put this stuff in my arms, and I was forced to carry it over there.

We never heard that until today or—

MR. ZAPPEN: Objection, Your Honor.

THE COURT: Objection is sustained.

MR. ZAPPEN: We will have a motion to accompany that objection.

THE COURT: I don't believe it's sufficient. I will overrule your motion immediately.

The jury is instructed to disregard those statements of the District Attorney.

Questioning a defendant about his failure to reveal an alibi to the authorities or commenting during closing arguments on a defendant's silence is improper. *Doyle v. Ohio,* 426 U.S. 610 (1976); *Neely v. State,* 86 Wis.2d 304, 272 N.W.2d 381 (Ct. App. 1978), *aff'd,* 97 Wis.2d 38, 292 N.W.2d 859 (1980). The rationale for this rule was stated in *Neely,* 86 Wis.2d at 316, 272 N.W.2d at 386:

The comment by the district attorney was clearly improper. No inference whatsoever can be drawn from the defendant's silence prior to trial. If the fifth amendment means anything, it not only means that the defendant has the right to refrain from making statements that might tend to incriminate him, but it also means that the exercise of that right will not be used against him later in a criminal proceeding.

The state argues that the prosecutor's questions and comment were not designed to bring out the fact of Feela's silence, but were intended to impeach a prior inconsistent story. *Anderson v. Charles,* 447 U.S. 404 (1980) (per curiam). During questioning, Feela informed Officer Gardner that he had hitchhiked to Wisconsin Rapids. Gardner asked Feela if he had hitchhiked in his shirt. At that point, Feela quit answering questions.

The fact that Feela did not inform Gardner that he had been wearing a parka which was taken from him does not give rise to an inconsistent statement for which Feela may be impeached. The statement Feela gave—that he had been hitchhiking—was consistent with the alibi he presented at trial. It was not rendered inconsistent by his decision to stop talking before he told his entire story. "Decisions of this court, as well as those

of the United States Supreme Court, clearly establish that a defendant has a right to answer some questions after the *Miranda* warning and then to reassert the privilege and break off all questioning." *Odell v. State,* 90 Wis.2d 149, 155, 279 N.W.2d 706, 709 (1979) (per curiam) (on rehearing). Feela cannot be penalized for his eventual exercise of his right to remain silent by having his silence used against him at trial.[6] *Odell, supra.*

We conclude that the state committed error in its questioning of Feela, and in its closing argument. We further conclude that the error was harmless.

We may find a federal constitutional error to be harmless only if we are "able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24 (1967). In order to declare such a belief, we must find that there is no "reasonable possibility" that the error "might have contributed to the conviction." *Chapman,* 386 U.S. at 23, quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87 (1963).

The Wisconsin Supreme Court has held that "the relevant factors considered when determining whether a constitutional error is harmless include (1) the frequency of the error, (2) the nature of the state's evidence against the defendant, and (3) the nature of the defense." *Rudolph v. State,* 78 Wis.2d 435, 443, 254 N.W.2d 471, 474–75 (1977) (per curiam), *cert. den.,* 435 U.S.

---

[6] The state attempts to draw a distinction between Feela's exercise of his right to remain silent before and after he was given his *Miranda* warnings. There is no constitutional problem with using a defendant's pre-arrest silence to impeach his credibility. *Jenkins v. Anderson,* 447 U.S. 231 (1980). We have rejected, however, the argument that it is also proper to use a defendant's post-arrest but pre-*Miranda* warning silence for that purpose. *Neely v. State,* 86 Wis.2d 304, 318, 272 N.W.2d 381, 387 (Ct. App. 1978), *affd* 97 Wis.2d 38, 292 N.W.2d 859 (1980).

944 (1978). The improper questioning was not frequently repeated. The first segment of questioning reproduced above is ambiguous; a jury could not clearly determine from Feela's answer that he did not present his full alibi to Gardner during questioning. The second segment is more objectionable, but is again ambiguous. Feela indicated that he did not have a chance to answer questions and did not recall whether he specifically mentioned that his parka was taken from him. The improper questioning amounted to one or two minutes in the midst of a five-day trial. There is no reasonable possibility that such brief and confusing questioning might have contributed to Feela's conviction.[7]

Our conclusion is bolstered by examining the state's evidence against Feela and the nature of his defense. Feela's alibi was contradicted by the testimony of several witnesses. The boots and shirt he was wearing when captured were repeatedly identified as those worn by the robber. Feela could not explain why he hid the gun, gloves, and vest supposedly given him by the true robber. His statement that he had been shot at was contradicted by witnesses who testified that they heard no shot when they saw Feela lie down on the sidewalk. This is not a case where questioning a defendant on his failure to reveal his alibi was highly prejudicial in that it created the impression that the defendant was fabricating his story. *See McLemore v. State,* 87 Wis.2d 739, 275 N.W. 2d 692 (1979). That impression was necessarily created by the witnesses who testified against him and by the physical evidence produced by the state.

---

[7] Defense counsel did not object to the improper questioning at trial. Although he did not thereby waive his right to raise this issue on appeal, his "failure to raise the errors is indicative of counsel's view of the seriousness of the error." *Odell v. State,* 90 Wis.2d 149, 155, 279 N.W.2d 706, 709 (1979) (per curiam) (on reconsideration).

While the improper comment during the state's closing argument compounded the error, an objection was immediately lodged and the jury was instructed to disregard the prosecutor's statements. Possible prejudice to a defendant "is presumptively erased from the jury's collective mind when admonitory instructions have been given by the court." *State v. Bowie,* 92 Wis.2d 192, 210, 284 N.W.2d 613, 621 (1977). *See also, Madden v. Israel,* 478 F. Supp. 1234, 1243 (E. D. Wis. 1979) (where counsel does not dwell on point and where judge immediately gives cautionary instruction, improper comment on defendant's silence and rendered harmless). While this presumption would be rebutted by an error more serious than the one which appears here, the infrequent occurrence of the error and the strength of the state's case convince us that the combined effect of the errors in questioning Feela and commenting on his silence were harmless beyond a reasonable doubt.

(3) *Sufficiency of Evidence: Attempted Murder*

Sabin argues that the evidence was not sufficient to permit a jury to find that he aided and abetted in Feela's attempted murder. He contends that there was no evidence that Sabin rendered aid to Feela in the shooting, that he stood ready to render aid, or that Feela knew of his willingness to render aid. He argues that Sabin did not know that a shooting would occur before the fact, and was unaware of who had done the shooting after the fact. Instead of rendering aid, Sabin drove off.

Similar arguments were rejected in *State v. Asfoor,* 75 Wis.2d 411, 249 N.W.2d 529 (1977), and *State v. Cydzik,* 60 Wis.2d 683, 211 N.W.2d 421 (1973). As the court stated in *Asfoor,* 75 Wis.2d at 428, 249 N.W.2d at 536:

[*Cydzik*] recognized that one who drives a getaway car in an armed robbery is presumed to intend the natural

consequences of his act. . . . [Asfoor's] acts demonstrated that if assistance became necessary in the commission of a crime he was ready to provide it. In fact, he did provide assistance by allowing the use of one of his guns and by driving Schubert and Jewell to the motel. Without his assistance the crime could not have taken place. When he set out he aided his companions and must be held responsible for the natural consequences of his act.

The facts of *Asfoor* are analogous to those now before us. We conclude that the holding of *Asfoor* controls in this case.

Recognizing the applicability of *Asfoor*, Sabin argues that the court erred in failing to instruct the jury that it was required to find that attempted murder was a natural and probable consequence of the intended criminal acts before it could find him guilty as a party to the crime. Sabin is correct in stating that *Asfoor*, 75 Wis.2d at 432, 249 N.W.2d at 538, holds that it is error not to provide such an instruction. Sabin did not, however, request that a natural and probable consequences instruction be given. "This court will not find error in the failure of a trial court to give a particular instruction in the absence of a timely and specific request before the jury convenes." *Bergeron v. State*, 85 Wis.2d 595, 604–05, 271 N.W.2d 386, 388 (1978). *See also* sec. 805.13(3), Stats; *State v. Olsen*, 99 Wis.2d 572, 581–82, 299 N.W.2d 632, 637 (Ct. App. 1980). We hold that Sabin waived his claim of error by failing to request an appropriate instruction or to object to the given instructions as incomplete.

*By the Court.*—Judgments affirmed.