**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lawton Scott MOCK,**
**Defendant-Appellant.**

No. 78–5536.

United States Court of Appeals,
Fifth Circuit.

Oct. 9, 1979.

See also 5th Cir., 604 F.2d 336.

342

Arnold D. Levine, Tampa, Fla., for defendant-appellant.

Anthony LaSpada, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before GOLDBERG, FAY and RUBIN, Circuit Judges.

FAY, Circuit Judge:

Appellant was convicted on two counts of tax evasion. Finding that the government was prohibited by collateral estoppel from presenting some of the factual evidence used to convict the appellant, we reverse.

Count I of the indictment charged a violation of 26 U.S.C. § 7203 (1976). The indictment alleged that the appellant failed to make an income tax return for gross income received during the calendar year 1972. Count II charged the appellant with wilfully and knowingly attempting to evade income tax due for income received during the calendar year 1972 by failing to make an income tax return and by making false statements to treasury agents in an attempt to conceal his taxable income. The indictment charged that these alleged actions violated 26 U.S.C. § 7201 (1976). Count III of the indictment charged that the appellant filed a false and fraudulent income tax return for income received during the calendar year 1973, a violation of 26 U.S.C. § 7201. Appellant entered a plea of not guilty. The jury returned a verdict of guilty as to counts I and II and not guilty as to count III. On appeal, appellant raises several claims in addition to his collateral estoppel claim, but none of these have merit.

I.

In order to consider the impact of the collateral estoppel doctrine on this case, it is of course necessary to relate in detail the nature of the charge in the first trial and the evidence adduced in support thereof. The prior prosecution which gives rise to the collateral estoppel question was a one-count indictment charging appellant with conspiracy to import, possess, and distribute marijuana in the United States. The indictment charged that the conspirators imported large quantities of marijuana from Colombia, South America into Zephyrillis, Florida aboard a DC–3 aircraft. The marijuana was then taken to parts of Florida and New York, where it was sold. As overt acts in furtherance of the conspiracy, the indictment alleged that appellant's co-conspirators imported marijuana into this country on April 9, 1972 from Colombia and that large amounts of money changed hands. The other individuals named in the indictment were Pedro Alvarez, Michael Sarga, Derril Lee, Jerold Martin Massler, Paul Rice, John Leslie Wells, Pedro Davilla, and Raoul Alberto Davillo.

The government's primary witness at both trials was William Rand Kilgore. The following facts were introduced through Kilgore in the first trial to show a conspiracy to import and distribute marijuana and in the second trial to show that appellant received income from that same scheme: Kilgore testified to the effect that appellant and Alvarez were in the marijuana business together. First trial transcript ["First trial"] at 181–83, 564; Second transcript ["Second trial"] at vol. V, p. 78–79, 82. Alvarez hired Kilgore to guard the "stash house," where the marijuana was stored. First trial at 9; second trial at vol. V, p. 59–60. Appellant and Alvarez took Kilgore to the "stash house" in February, 1972. First trial at 11; second trial at vol. V, p. 61. Kilgore received money in exchange for marijuana at the "stash house." First trial at 13; second trial at vol. V, p. 62–63. In February of 1972, appellant and another person visited the "stash house." First trial at 22–24; second trial at vol. V, p. 62. At Alvarez' direction, Kilgore, along with pilots John Wells and Paul Rice, flew a DC–3 aircraft to Colombia and returned to Zephyrillis, Florida with a substantial quantity of marijuana. First trial at 150–77; second trial at vol. V, p. 72–77. Appellant, Lee and Alvarez unloaded the marijuana from the aircraft into a Winnebago motor

home. First trial at 179; second trial at vol. V, p. 77–78. The marijuana was taken by Kilgore, appellant, Alvarez, and others to Wayne Hockett's house. Hockett received one-third, and Mock and Alvarez kept two-thirds of the marijuana.[1] First trial at 180–83; second trial at vol. V, p. 78–79. While Mock and Kilgore were in the Winnebago, Mock told Kilgore that he and Alvarez were looking for someone "to take over the operation," meaning the handling of the marijuana. First trial at 181–83; second trial at vol. V, p. 78–79. Significantly, Kilgore testified at the second trial that he had had no contact with appellant before December 31, 1971 or after June, 1972. Thus, Kilgore's only contact with the appellant was during the period covered by the marijuana conspiracy charge of which appellant was acquitted.

After all the evidence had been presented at the first trial, the jury was unable to arrive at a verdict and the trial court declared a mistrial. Pursuant to Fed.R. Crim.P. 29, the court then acquitted the appellant, stating: "[T]he Court is persuaded as to Defendant Mock (and for the reasons articulated in counsel's post-trial memorandum in his behalf) that a reasonable-minded jury would necessarily have to have a reasonable doubt as to his guilt."[2] The memorandum alluded to by the court argued that Kilgore, the only witness to testify against appellant in that trial, was so unbelievable as to be insubstantial. In attacking the credibility of Kilgore's testimony, the memorandum pointed out inconsistencies between his testimony at trial and his testimony at prior proceedings,[3] the immunity which he was granted by the government, his inability to recall facts such as the year of his felony conviction,

and his regular use of marijuana, hashish, heroin and cocaine, possibly leading to a loss of memory.

## II.

In principle, the law of collateral estoppel is clear; in application, it can be a slippery concept indeed. According to *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. at 1194. Thus, *Ashe* mandates two inquiries: First, what facts were necessarily determined in the first law suit? *See United States v. Ballard,* 586 F.2d 1060 (5th Cir. 1978); *Adams v. United States,* 287 F.2d 701 (5th Cir. 1961). Second, has the government in a subsequent trial tried to relitigate facts necessarily established against it in the first trial? Facts so established in the first trial may not be used in the second trial either as ultimate or as evidentiary facts. *Blackburn v. Cross,* 510 F.2d 1014 (5th Cir. 1975); *Wingate v. Wainwright,* 464 F.2d 209 (5th Cir. 1972). Thus, while the parent doctrine of double jeopardy bars a subsequent prosecution based on a different section of the criminal code when "the evidence required to support a conviction upon one of them [the indictments] would have been sufficient to warrant a conviction upon the other,"[4] its progeny, collateral estoppel, bars only the reintroduction or relitigation of *facts* already established against the government. To state the distinction in more prosaic terms, the traditional bar of double jeopardy prohibits the

---

1. At the first trial, Kilgore testified that appellant received one-third of the marijuana. At the second trial, he testified that appellant and Alvarez together received two-thirds of it. We mention the difference only for purposes of accuracy.

2. For purposes of applying collateral estoppel, it makes no difference that the trial judge, rather than a jury, acquitted the appellant. *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977).

3. One of these inconsistencies was Kilgore's previous failure to identify appellant out of pictures presented to him in prior proceedings and his ability to pick appellant out of those same pictures in the conspiracy trial.

4. *Morey v. Commonwealth,* 108 Mass. 433, 434 (1871).

prosecution of the crime itself, whereas collateral estoppel, in a more modest fashion, simply forbids the government from relitigating certain facts in order to establish the fact of the crime. *See United States v. Kramer,* 289 F.2d 909 (2d Cir. 1961) (Friendly, J.).

### III.

The problem here is that the government urged in the tax evasion case that appellant received income from the very conspiracy operation of which he had been acquitted in the first trial. In addition, the government elicited essentially identical testimony from Kilgore to prove that he received income from the marijuana conspiracy.

 Generally, it is true that a defendant may be acquitted of conspiracy without collaterally estopping the government from later presenting the evidence necessary to convict him of the substantive crime which was the object of the conspiracy. *See United States v. Ballard,* 586 F.2d 1060 (5th Cir. 1978). In addition, since the charges require different elements of proof, double jeopardy would pose no bar to the subsequent prosecution. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Wingate v. Wainwright,* 464 F.2d 209, 214 (5th Cir. 1972). *Ashe* teaches, however, that we must " 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter,' " 397 U.S. at 444, 90 S.Ct. at 1194 (footnote omitted), in order to assess the applicability of collateral estoppel. "The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' " *Id., quoting Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1947). In taking this pragmatic approach, the court in *Sealfon,* while recognizing that conspiracy and the substantive offense are different for double jeopardy purposes, nevertheless held that an acquittal on the charge of conspiracy to defraud the United States prohibited the government from later trying to prove that the defendant committed the substantive offense of defraud-

ing the United States, since "the core of the prosecutor's case was in each case the same . . .." 332 U.S. at 580, 68 S.Ct. at 240; *accord, United States v. Kramer,* 289 F.2d 909, 919 (2d Cir. 1961). Likewise, in *Yawn v. United States,* 244 F.2d 235 (5th Cir. 1957), a case notably similar to the instant case, the defendant was first tried and acquitted of possession of a still at a certain time and place; he was subsequently charged with a conspiracy to engage in the business of a distiller without paying taxes thereon. As an overt act in the conspiracy indictment, the government alleged and proved that the defendant jointly possessed "the identical still at the identical time and place charged in the earlier trial." *Id.* at 237. This Court stated:

> In the present case the Government had, and has, every right to establish the guilt of the accused of the separate offense of conspiracy to violate the liquor tax laws despite the acquittal of unlawful possession of the still. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489. But to allow the Government to have a second opportunity to establish the precise fact of possession decided by another Court of competent jurisdiction in favor of the accused is to ignore the rule that " . . . the same facts can not be twice litigated by the same sovereign against the same defendant.

*Id.* at 237 (citations omitted).

Theoretically it is true that appellant might be found not guilty of the conspiracy charge and yet have committed the substantive crimes of importation and distribution of marijuana; and it therefore might also be theoretically true that even though the first trial established as a fact that appellant was not a member of the Alvarez conspiracy, appellant might nevertheless have derived taxable income from the distribution or sale of marijuana in 1972, (from sources other than the Alvarez group). The first trial established at least that the appellant was not involved in a conspiracy to import, possess, and distribute marijuana with the people described in the indictment

from January to June of 1972. If the government had presented evidence that appellant had derived income from the sale of marijuana on facts other than those showing that he derived income *from this particular conspiracy,* then such evidence would be neither inconsistent with the prior verdict of acquittal nor barred by collateral estoppel. However, the facts of this case do not conform to these hypotheticals: The government based its case upon the very theory that appellant derived income from the conspiracy of which he already had been acquitted.

The critical issue at trial was where and when appellant received income resulting in an increase in his net worth. Appellant did not seriously dispute that his net worth had increased; in closing argument, appellant's counsel argued, however, that the increase was a result of interest charged on loans made while he was in the Navy, many years before. Appellant claimed that his only connection with Alvarez was through a used typewriter business they were starting.[5] Both in opening and closing argument, the prosecutor argued at length that the real source of appellant's income was the Alvarez marijuana conspiracy. The prosecutor described Alvarez and appellant as "the big bosses," second trial at supp. vol. 2, p. 172, in the marijuana smuggling operation. Six times in closing argument the prosecutor argued that appellant derived his income from marijuana sales with his partner Alvarez.[6] *Id.* at 172, 174, 175, 178, 181, 255, 265. Most of these arguments were supported with direct reference to Kilgore's testimony.[7] One of those references bears quotation, since it clearly shows that the government argued appellant's involvement in the Alvarez conspiracy, a fact which had already been resolved against it, to suggest a likely source of income: "And those facts [referring to Kilgore's testimony] reflected his involvement with the de-

fendant Mock and his involvement *in the conspiracy,* the smuggling." *Id.* at 256 (emphasis added).

Just as it did in *Yawn, Kramer* and *Sealfon,* the government in this case attempted to prove events which were in "unity of time and place," *Douthit v. Estelle,* 540 F.2d 800, 805 (5th Cir. 1976), with events which were established against it at the first trial. Legally, appellant simply could not have derived income *from the Alvarez conspiracy,* when he was acquitted at the first trial in the face of Kilgore's testimony that appellant and Alvarez were the kingpins of the marijuana operation.[8] This was not a case where an acquittal on a conspiracy charge can reasonably be understood to mean that the jury had no basis to find the essential element of agreement. If believed at all, Kilgore's detailed account shows without question that Alvarez and appellant were partners in a profit-making marijuana smuggling operation. Having defended at the first trial the government's contention that he was in this business with Alvarez, the appellant must not be required to do so again when the government later uses it for a different purpose.

■ It matters not that appellant's acquittal on the conspiracy charge does not negate the possibility that he may otherwise have derived income from the sale or distribution of marijuana. The fundamental error here is that the government reintroduced the identical facts and theory of the facts which were rejected at the first trial. For purposes of any subsequent prosecution of appellant, appellant's acquittal has conclusively established that appellant did not participate in a marijuana conspiracy with Alvarez and the others mentioned by Kilgore during the time frame of the first indictment—January to June, 1972. Consequently, the government is barred

---

5. We note that at the first trial appellant made the same contention in response to the government's claim that he and Alvarez were in the business of smuggling marijuana.

6. Three of these arguments are reproduced at note 11 *infra.*

7. See note 11 *infra.*

8. "The law is a sort of hocus-pocus science." C. Macklin, *Love a la Mode,* Act II, Sc. 1 (1759).

from arguing or trying to establish, for any purpose, that appellant was part of that conspiracy.

## IV.

■ There remains the question of whether the introduction of this testimony and the arguments made by the prosecutor were merely harmless error.[9] In applying the harmless error doctrine in the collateral estoppel area, the Court in *Blackburn v. Cross*, 510 F.2d 1014, 1019 (5th Cir. 1975) stated:

> Recent Supreme Court decisions regarding "harmless constitutional error" inquire as to "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Only if the court can declare with confidence "beyond a reasonable doubt" that such a possibility is excluded by the record can it declare a constitutional error harmless. *Id.* at 24, 87 S.Ct. 824.

Applying this standard, we find the error was prejudicial.

As noted, both the government and the appellant agreed that the source of appellant's increased net worth was the critical issue in the case. Kilgore's testimony, which covered only the period of January to June, 1972, was immeasurably important in supporting the government's contention on this point. In terms of sheer quantity, it spans some 300 pages. It is a highly detailed first hand account of transactions in which Kilgore himself purportedly took part.

Sandra Scott was the only other witness at the second trial to support the govern-

ment's contention that appellant received income from marijuana transactions in 1972. Scott's testimony related to events which occurred in December of 1972, a period not covered by the first trial. From a careful comparison of Kilgore's and Scott's testimony, it is apparent that Scott's testimony was basically corroborative of Kilgore's and not nearly as damaging. In contrast to Kilgore's detailed account of the actual smuggling, transportation, and distribution of marijuana, Scott's testimony was almost totally confined to recounting conversations among appellant and others concerning marijuana transactions. The only overt act which Scott claims to have witnessed was the payment of money by appellant and Alvarez to Scott's husband as part of a marijuana deal.

This is not a case where we might conclude that Scott's testimony was sufficient to support the conviction, since her testimony, by itself, shows a likely source of income.[10] It must be remembered that neither Scott nor Kilgore testified to specific amounts of money changing hands or being earned by appellant. The government neither tried, nor was required to prove precisely how much appellant earned through these transactions. The purpose of both witnesses' testimony was simply to show that appellant's marijuana transactions formed a likely source of income. Appellant testified that he had earned the income by lending money when he was in the Navy and not in 1972. To corroborate his story, he presented one of his former companions in the Navy who stated that appellant used to save his money so that he could lend it out for interest. Thus, the jury was asked

---

**9.** We note that appellant's attorney moved *in limine* to exclude any of Kilgore's testimony which would show a conspiracy or business in marijuana between Alvarez, Kilgore, and the others mentioned at the first trial.

**10.** In *United States v. Beasley*, 576 F.2d 626 (5th Cir. 1978), we were faced with a similar question. The defendant was charged with the wilful evasion of income taxes, and the government produced two witnesses to testify that he received income from a conspiracy to distribute heroin. On appeal of the conviction, we found that the Jencks Act, 18 U.S.C. § 3500 (1976),

was violated and that the Jencks material would have aided the defense in impeaching one of these two witnesses. We nonetheless held that the Jencks violation was harmless as to the tax prosecution, since "there was convincing testimony by Mrs. Heron [the other witness], unrebutted save by Beasley's personal denial, that Beasley was engaged in illicit activities potentially generating income." *Id.* at 633. The differing posture of the witnesses in this case requires a contrary result on the harmless error question.

to choose between believing appellant and his witness or Kilgore and Scott. Had appellant earned his money in 1972 through marijuana dealings or had he earned it while in the Navy? In view of the quality and quantity of Kilgore's testimony as compared to Scott's testimony, the only other evidence on this question, we are not assured beyond a reasonable doubt that the jury would have reached the same decision solely on the basis of Scott's testimony. Without Kilgore's testimony, they may not have believed Scott.

Moreover, the government's opening and closing arguments relied heavily on facts which had been foreclosed to it by the first trial. As noted above, the government argued on more than six occasions that appellant received his income from the Alvarez conspiracy transactions. Three of these arguments were coupled with direct references to Kilgore's testimony.[11] We therefore conclude that the appellant's conviction must be reversed.

REVERSED and REMANDED for Retrial.

---

11. The following shows that the conspiracy and the events covered by the first trial comprised a substantial portion of the government's argument to the jury:

> Randy Kilgore testified that he went to Colombia, South America, and then came back and they unloaded that marijuana in Zephyrhills. And what did they unload that marijuana into? Remember he said a Winnebago and that he then drove over to a Wayne Hockett's house. They unloaded a third of that marijuana and he and Scott Mock got back in that Winnebago and Scott Mock at that time asked if he would like to handle that end of the operation: fly down and guard that marijuana for him and Pedro Alvarez, so they wouldn't have to touch it. They wouldn't have to do that themselves. The big bosses didn't want to take a chance of handling the marijuana. . . . It was business, ladies and gentlemen. It was business of contacting and arranging for the importation of marijuana, so they could sell it. That's the kind of business he was in.
>
> Second trial at supp. vol. 2, p. 177–78.

If you recall Mr. Kilgore's testimony . . . And those facts reflected his involvement with Defendant Mock and his involvement with Mr. Alvarez and his involvement in the conspiracy, the smuggling.
*Id.* at 255.

That's what Mr. Levine would have you believe and ladies and gentlemen, applying your good logic and common sense, we submit to you, it's not a reasonable explanation. That money, according to Mr. Kilgore's testimony, "We started working for them in 1972." Is that when they got into that marijuana business? They both left their jobs at IBM, in the summer, August or July or August of 1971. They opened up that safety deposit box, in December was when it opened. Carried over after they started to get involved in that activity in the early part of 1972. And that's when the money started to come in, and when the money came in, the defendant started spending it. And he started spending it to the tune of $87,022.15, that we can show in 1972. And, $46,536.00 in 1973.
*Id.* at 265.