Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANT:

**SCOTT KING**
**RUSSELL W. BROWN, JR.**
Scott King Group
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHANDRA K. HEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

BRANDON STEWART,                    )
                                       )

    Appellant-Defendant,            )

           vs.                          )    No.  45A03-1301-CR-6

STATE OF INDIANA,                    )

    Appellee-Plaintiff.             )

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Salvador Vasquez, Judge
Cause No. 45G01-1103-FA-6

**September 30, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Brandon Stewart was charged with five sex offenses, three involving his sister-in-law, A.W. (counts I, III, and V), and two involving her cousin, B.G. (counts II and IV). At trial, A.W. and B.G. testified that Stewart had each of them perform oral sex on him in their aunt's garage in Hammond. They also testified to several incidents that happened in their aunt's basement. B.G. testified that on one occasion, Stewart rubbed her side, and on another, he patted her on the buttocks. A.W. testified that on two occasions he had her perform oral sex on him. She also testified that there were two incidents when Stewart was driving her home and he had her perform oral sex in the vehicle. Her family lived in Illinois at the time, and she testified that the incidents in the vehicle happened in Illinois.

The girls did not disclose these incidents until several months later, and they had difficulty remembering when they had happened. A.W. turned fourteen during the general timeframe that these events occurred, and her age was a key issue at trial, as one of the offenses was alleged to have occurred when she was thirteen, and two (counts III and V) were alleged to have occurred when she was fourteen. After the girls' testimony, Stewart moved to dismiss counts III and V, arguing that the evidence reflected that the only incidents that occurred when A.W. was fourteen were the two that occurred in Illinois. The trial court ruled that there was sufficient evidence to submit the issue to the jury. The jury ultimately found Stewart guilty of all charges except count I, which allegedly occurred when A.W. was thirteen.

Following trial, Stewart filed a motion to correct error, in which he again argued that counts III and V should have been dismissed and claimed that he was entitled to a new trial based on newly discovered evidence. The newly discovered evidence was an affidavit from A.W.'s uncle, who claimed that she had recanted during a telephone conversation. The trial court denied the motion to correct error. The court then conducted a sentencing hearing and imposed an aggregate sentence of forty-six years.

On appeal, Stewart raises five issues: (1) whether the trial court abused its discretion by denying his motion to correct error on the issue of whether counts III and V should have been dismissed; (2) whether there was sufficient evidence to support the convictions on counts III and V; (3) whether the doctrine of collateral estoppel precludes a guilty verdict on count II in light of the acquittal on count I; (4) whether the trial court abused its discretion by denying Stewart's motion to correct error on the issue of newly discovered evidence; and (5) whether his sentence is inappropriate.

We affirm. Stewart's first two issues turn on whether there was sufficient evidence for the jury to find that two of the incidents involving A.W. occurred in Indiana when she was fourteen. A.W. initially testified that all three of the incidents in Indiana occurred when she was thirteen; however, after she was confronted with her deposition, she agreed with her deposition testimony that the incident in the garage had occurred sometime after she returned home from a trip to California, which was after her fourteenth birthday. A.W. also testified that the incident in the garage occurred before the incidents in the basement; thus, the jury could have believed that all three happened when she was fourteen. As to the third issue, we

conclude that collateral estoppel does not apply to two verdicts rendered at the same time, and even if it did, the jury may have acquitted Stewart on count I because it did not believe that A.W. was thirteen at the time of the offense. B.G.'s age, however, was not at issue. As to the fourth issue, there was evidence that A.W. was being pressured by family members to recant; therefore, it was within the trial court's discretion to determine that her uncle's affidavit was not worthy of credit. Finally, Stewart has not persuaded us that his sentence is inappropriate. Two of his sentences were imposed consecutive to the other two in recognition of the fact that there were two victims. Although Stewart has no criminal history and had been gainfully employed and providing for his family, the nature of the offenses fully justifies the slightly enhanced sentences that he received. Therefore, we affirm.

**Facts and Procedural History**

In the summer and fall of 2010, A.W. and B.G., who are cousins, spent a lot of time at their Aunt Cara's house in Hammond. During this time, B.G. was twelve, and A.W. turned fourteen on August 19 of that year. Several relatives were living in Cara's house, including Gabrielle, who is A.W.'s adult sister, and Stewart, who is Gabrielle's husband. A.W. often babysat Stewart and Gabrielle's children.

A.W. and B.G. later told their parents that Stewart had touched them in an inappropriate manner on several occasions during the summer and fall of 2010. One incident occurred in Cara's garage. Stewart closed the door, turned off the lights, and asked the girls

4

if they knew what a "BJ" was. Tr. at 45.[1] The girls said that they did. Stewart then asked if they knew "how to give one," and they said that they did not. *Id*. The girls were inconsistent about the order of events that followed, but both indicated that Stewart had each one suck his penis while the other stood watch at the door.

Several incidents also occurred in Cara's basement, where Stewart's family was living. B.G. testified that on one occasion, several people were watching television in the basement, but everyone ended up going upstairs except for B.G. and Stewart. Stewart started rubbing B.G.'s side, and she told him to stop. He did it again, and she pushed his hand away and went upstairs. She also testified that on another occasion, she was walking up the stairs, and Stewart touched her buttocks. She then ran up the stairs more quickly.

A.W. testified that there was an incident that occurred while she was in the basement taking care of Stewart's baby. The baby started crying, and Stewart took the baby from A.W., and A.W. started playing a video game. Stewart sat down close to her and touched her breast. A.W. pushed his hand away. Holding the baby in his left arm, Stewart used his right hand to unzip his pants, place his penis in A.W.'s mouth, and hold the back of her head while "pumping [A.W.'s] face." *Id*. at 107. Stewart heard Gabrielle enter the house and stopped. A.W. also testified that there was a second incident when she was playing a video game in the basement, and Stewart had her suck his penis until he ejaculated.

---

[1] Indiana Appellate Rule 28(A)(2) requires the pages of the transcript to be numbered consecutively regardless of the number of volumes; however, in this case, the transcripts of the trial and the sentencing hearing were separately paginated. We will cite the trial transcript as "Tr." and the sentencing transcript as "Sentencing Tr."

Finally, two incidents occurred in the car while Stewart was driving A.W. home after babysitting. Stewart told her that she should do him "a favor" for driving her home and made her touch his penis and perform fellatio. *Id*. at 109. A.W.'s family lived in Lansing, Illinois, at the time, and A.W. testified that the incidents in the car occurred in Illinois.

Around February 2011, A.W.'s family moved to a house in Hammond, and Stewart's family moved in with them. A.W.'s stepfather, Lavell Reed, noticed that A.W.'s demeanor had been changing and got much worse after Stewart's family moved in with them. A.W. would cry "for no reason" and seemed detached, angry, and not her normal outgoing self. *Id*. at 177. On February 5, 2011, Reed was finally able to get A.W. to tell him what was wrong. Reed then contacted B.G.'s father, Patrick. Patrick asked B.G. "if something had happened between her and Brandon [Stewart] and [A.W.]" *Id*. at 208. B.G. was embarrassed and ashamed, broke down in tears, and told her father what had happened.

Reed and Patrick then went to Stewart's place of employment to confront him. Although they never told him the girls' specific allegations, Stewart claimed that the girls were lying. Reed and Patrick then went to the Hammond Police Department to make a report, and because it was after hours, they were told that one of the officers on patrol would be sent to Patrick's house. Officer James Bigham took statements from the girls at Patrick's house. Sometime that evening or early the next morning, Gabrielle moved her family out of Reed's house. The case was turned over to Detective Christopher Matonovich, who arranged videotaped forensic interviews of the girls and attempted to get statements from other family members.

On March 11, 2011, Stewart was charged with five felonies stemming from the girls'

allegations. As amended, the five charges read as follows:

COUNT I
[CHILD MOLESTING (A)]

Affiant, upon oath, says that between April 1, 2010 and August 18, 2010, in the County of Lake, State of Indiana, Brandon D. Stewart, a person at least twenty-one (21) years of age, did perform or submit to deviate sexual conduct with [A.W.], a child under fourteen (14) years of age, contrary to I.C. 35-42-4-3, and against the peace and dignity of the State of Indiana.

COUNT II
[CHILD MOLESTING (A)]

Affiant, upon oath, says that between July 1, 2010 and October 31, 2010, in the County of Lake, State of Indiana, Brandon D. Stewart, a person at least twenty-one (21) years of age, did perform or submit to deviate sexual conduct with [B.G.], a child under fourteen (14) years of age, contrary to I.C. 35-42-4-3, and against the peace and dignity of the State of Indiana.

COUNT III
[SEXUAL MISCONDUCT WITH A MINOR (B)]

Affiant, upon oath, says that between August 19, 2010 and October 31, 2010, in the County of Lake, State of Indiana, Brandon D. Stewart, being at least twenty-one (21) years of age or older, did perform or submit to deviate sexual conduct with [A.W.], a child at least fourteen (14) years of age but less than sixteen (16) years of age, contrary to I.C. 35-42-4-9, and against the peace and dignity of the State of Indiana.

COUNT IV
[CHILD MOLESTING (C)]

Affiant, upon oath, says that between July 1, 2010 and October 31, 2010, in the County of Lake, State of Indiana, Brandon D. Stewart did perform or submit to the fondling or touching of [B.G.] with intent to arouse or satisfy the sexual desires of Brandon D. Stewart or [B.G.], a child under fourteen (14) years of age, contrary to I.C. 35-42-4-3 and against the peace and dignity of the State of Indiana.

COUNT V
[SEXUAL MISCONDUCT WITH A MINOR (C)]

      Affiant, upon oath, says that between August 19, 2010 and October 31, 2010, in the County of Lake, State of Indiana, Brandon D. Stewart, being at least twenty-one (21) years of age or older, did perform or submit to the fondling or touching of [A.W.] with intent to arouse or satisfy the sexual desires of Brandon D. Stewart, or [A.W.], a child at least fourteen (14) years of age but under sixteen (16) years of age, contrary to I.C. 35-42-4-9, and against the peace and dignity of the State of Indiana.

Appellant's App. at 38-39.

Count II relates to the incident in the garage, where Stewart had B.G. perform fellatio on him. Count IV apparently relates to the times when Stewart rubbed B.G.'s side and/or touched her buttocks. It is unclear which incidents Counts I, III, and V, in which A.W. was the alleged victim, were intended to relate to. Count I was alleged to have occurred when A.W. was thirteen, and Counts III and V were alleged to have occurred when she was fourteen. *Compare* Ind. Code § 35-42-4-3 (offense of child molesting occurs when the victim is under the age of fourteen) *with* Ind. Code § 35-42-4-9 (offense of sexual misconduct with a minor occurs when the victim is at least fourteen but less than sixteen). Because the girls made several inconsistent statements about when the incidents occurred, A.W.'s age at the time of each incident was a key issue at trial.

On direct examination, A.W. testified that the incident in the garage occurred first and happened when she was thirteen. She also testified that the incidents in the basement happened when she was thirteen. On cross-examination, A.W. initially testified that the garage incident occurred before her fourteenth birthday. She was then reminded that in her deposition, she had stated that she was in California at the time of her fourteenth birthday and

8

that the garage incident occurred sometime after she returned on August 25. A.W. then agreed with her deposition testimony that the garage incident occurred after August 25. However, she changed her testimony again when she was asked about the incidents in the basement:

Q      When do you think [the first incident in the basement] occurred?

A      About a week or couple days after the incident in the garage occurred.

Q      Do you think that one occurred before your birthday?

A      Yes.

Q      And that was … before you went to California?

A      Yes.

….

Q      And again, the first time in the basement occurred before your birthday, right?

A      Yes.

Q      Okay. So we're talking about maybe – do you have an approximate time when the second time in the basement was?

A      Probably the end of July.

Q      Okay.

A      Middle of August.

Q      … I just want to make sure that we are in the right order. First time he ever touched you was out in the garage with [B.G.]?

A      Yes.

Q      Then the next time was in the basement when he was holding the baby?

9

A      Yes.

Q      Correct.  And then there was another time in the basement, right?

A      Yes.

Tr. at 133, 142.

B.G. testified that the garage incident happened when it "was raining and it was cold, so the summer transitioning to fall." *Id.* at 61.  However, it was not so cold that they were wearing coats.  B.G. thought that A.W. was fourteen at the time of the garage incident, but she also admitted that she did not know A.W.'s birthdate.  Officer Bigham testified that B.G. and A.W. had both reported that the garage incident occurred in October.  Detective Matonovich testified that on March 10, 2011, he contacted A.W. in an attempt to clarify the dates of the incidents.  A.W. told him that she was thirteen at the time of the garage incident. The parties also entered a stipulation that if Lake County Detective John Gruszka testified, he would state that A.W. told him that the first incident in the basement occurred sometime before her birthday and the trip to California.

After the girls testified, Stewart moved to dismiss counts III and V for lack of jurisdiction, arguing that the Illinois incidents could not be used to prove those charges.  The trial court concluded that there was evidence from which the jury could conclude that the incidents in Indiana occurred during the timeframe alleged in counts III and V and indicated that it would instruct the jury that their verdict could only be based on incidents that occurred in Lake County.  At the conclusion of the State's case-in-chief, Stewart moved for a directed verdict "on all counts … particularly as to Count III and V relating to the issue of whether

10

these incidents happened in Illinois or Indiana." *Id.* at 263. The trial court denied Stewart's motion. At the conclusion of the trial on October 24, 2012, the jury returned a verdict of not guilty on count I and guilty on the remaining counts.

On December 11, 2012, Stewart filed a "Motion to Correct Errors and For New Trial." Appellant's App. at 96. Stewart argued that the trial court erred by denying his motion to dismiss because A.W. testified that the incidents that occurred in Indiana happened when she was thirteen, and therefore, none of them supported the convictions on counts III and V. Stewart also requested a new trial on the basis that the verdict was against the weight of the evidence. Finally, Stewart requested a new trial on the basis of newly discovered evidence. The motion alleged that on November 27, 2012, defense counsel was contacted by JeanPaul Salvant, A.W.'s uncle, who stated that A.W. had recanted during a phone conversation. Stewart submitted an affidavit from JeanPaul in which he stated that he had spoken to A.W. on the phone on November 20, 2012. JeanPaul thought that A.W. seemed upset about Stewart being found guilty, so he asked her why she was upset. She said that "this was not how she planned for things to happen, and that the situation had gotten out of hand." *Id.* at 101. JeanPaul responded that "if the allegations she made against Brandon [Stewart] were true, then things are happening the way they should, but if the allegations were not true, she needed to step forward and notify the proper authorities." *Id.* at 102. A.W. then said that the allegations that she and B.G. had made were untrue. A.W. said that she made up the allegations to receive more attention from her mother, and she convinced B.G. to go along with the story because B.G. had a better reputation for truthfulness. JeanPaul encouraged her

11

to admit that she had lied, but A.W. said that she was afraid to do so because she could be charged with perjury.

A hearing was held on December 14, 2012. The trial court found that the jury's verdicts were supported by sufficient evidence and therefore rejected Stewart's arguments concerning counts III and V. In opposition to Stewart's arguments concerning newly discovered evidence, the State submitted evidence that JeanPaul's affidavit had not been properly notarized and that A.W. had been pressured by family members to recant, but continued to stand by her allegations. The notary stamp on JeanPaul's affidavit purports to be that of Neil A. Vaughan with commission number EE 11024 issued by the State of Florida.[2] The State submitted a printout from the Florida Department of State website showing that commission number EE 11024 is registered to Dominque Harris.

The State also submitted a police report from Detective Biller of the Hammond Police Department. The report indicates that the prosecutor had asked Detective Biller to investigate allegations that A.W. was being pressured to recant. A.W. and her mother, Racquel Salvant,[3] agreed to go with him to the police station to give recorded statements. Detective Biller first spoke to Racquel, who stated that, for financial reasons, Gabrielle and her children were living with her and A.W. Racquel claimed that Gabrielle had been pressuring A.W. to recant and told her that she would not get in trouble for doing so.

---

[2] JeanPaul resides in Florida.

[3] In the trial transcript, her name is spelled "Raquelle," and Gabrielle testified that she has the same last name as A.W. We will assume that Racquel Salvant is correct, as she spoke to Detective Biller in person, but did not testify at trial.

12

Gabrielle was also "using her children as leverage over [A.W.]" State's Sentencing Ex. 2. Racquel felt that A.W. looks up to Gabrielle and seeks her approval, even after everything that has happened. Racquel further stated that on November 25, 2012, she found bloody tissues in the bathroom and asked A.W. about it. A.W. told her that she had tried to "cut herself" while in the shower, but then did not go through with it. *Id.*

A.W. also told Detective Biller that Gabrielle was pressuring her to recant. She said that Gabrielle constantly reminds A.W. that she grew up without a father and asks if that is what she wants for her nephew and nieces. Regarding her conversation with her uncle, the report states:

> [A.W.] then stated that she talked to her Uncle Jean-Claude [sic] Salvant; whom she thinks of as a brother. While speaking to him, before Thanksgiving, she asked him for his opinion. He told her that she could lie and not get into any trouble, that she would not go to jail for perjury. She believed that Gabrielle had talked to him and that he was now on her side.

*Id.* As the pressure from Gabrielle continued and the sentencing hearing approached, A.W. attempted to use a piece of a broken mirror to cut her veins in the shower.

The trial court ruled that Stewart had not met the standard for showing that he was entitled to a new trial:

> I … can't necessarily say that … the information you provided is worthy of credit, since we have this police report indicating that this is not, in fact, going on, that she's recanted.… I don't necessarily believe that we're in a position that given the affidavit of Mr. Salvant – that even presuming to be a proper affidavit – would be sufficient to grant a new trial.…
>
> Your affidavit goes towards merely impeaching at this point. I don't necessarily believe that we would have a different result. I don't think that given the totality of information that I've received, with respect to this newly discovered evidence, that it would be proper for me to grant a new trial.

13

Sentencing Tr. at 19-20, 23.

The court then proceeded to conduct a sentencing hearing. Gabrielle testified that she and Stewart have three children. Their oldest child, who is six years old, has autism, which makes it difficult for Gabrielle to work outside the home. Stewart had been the one supporting the family financially. Stewart also offered testimony or letters from family members, friends, and coworkers, who spoke positively of his character. Patrick testified about how the family had been torn apart and that Stewart had "ruined any chance of [A.W.] having a relationship with her older sister." *Id*. at 37. Patrick also described how difficult it had been for B.G. to testify in court:

> Her having to repeat over and over again the horrible things you did to her brought tears to her eyes every time I told her we had to come to court. It took weeks for her to get back to normal. As much as she wanted to come here and make her own statement, she wasn't able to bring herself to do it.

*Id*. at 36. The prosecutor read a victim impact statement from A.W., in which she stated that the negative effects of the offenses included "losing the relationship with my sister, causing me mental and emotional pain and even thoughts of suicide." *Id*. at 38.

As mitigating factors, the trial court noted the hardship on Stewart's family and his lack of criminal history. For aggravating factors, the court noted that there were two victims, that Stewart had taken advantage of the girls' trust, and the nature and circumstances of the offenses; in particular, the court felt that the incident in the garage was "very troubling." *Id*. at 56. The court found that the aggravating factors outweighed the mitigating factors. The court imposed a sentence of thirty-three years on count II, thirteen years on count III, five years on count IV, and five years on count V. The court determined that the sentences for

14

counts II and IV (the offenses against B.G.) should be served consecutive to the sentences for counts III and V (the offenses against A.W.), for an aggregate sentence of forty-six years. Stewart now appeals.

**Discussion and Decision**

Stewart raises five issues on appeal: (1) whether the trial court abused its discretion by denying his motion to correct error on the issue of whether counts III and V should have been dismissed; (2) whether there was sufficient evidence to support the convictions on counts III and V; (3) whether the doctrine of collateral estoppel precludes a guilty verdict on count II in light of the acquittal on count I; (4) whether the trial court abused its discretion by denying Stewart's motion to correct error on the issue of newly discovered evidence; and (5) whether his sentence is inappropriate.

*I & II. Counts III and V*

Stewart argues that the uncontested evidence shows that A.W. was thirteen at the time of all three offenses that occurred in Indiana and that the only incidents that occurred when she was fourteen were the ones that occurred in Illinois. Therefore, Stewart argues that the trial court should have granted his motion to correct error, in which he argued that the court should have granted his motion to dismiss counts III and V for lack of subject matter jurisdiction. Alternatively, he argues that there is insufficient evidence to support the convictions on counts III and V.

Indiana courts treat territorial jurisdiction as an element of the offense that the State must prove beyond a reasonable doubt. *Yao v. State*, 975 N.E.2d 1273, 1276-77 (Ind. 2012).

15

The issue must be submitted to the jury unless the court determines that no reasonable jury could fail to find territorial jurisdiction beyond a reasonable doubt. *Id*. "If the court makes such a determination then no jury instruction on the issue is required and the question of jurisdiction is decided by the court as a matter of law." *Id*.

> When reviewing a challenge to the sufficiency of evidence, we do not reweigh the evidence or judge the credibility of witnesses. We look only to the probative evidence supporting the judgment and the reasonable inferences from that evidence to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt.

*Specht v. State*, 838 N.E.2d 1081, 1093 (Ind. Ct. App. 2005) (citations omitted), *trans. denied* (2006).

Although A.W. consistently testified that she was thirteen when the incidents in the basement occurred, the State notes that she also testified that the incidents in the basement happened after the incident in the garage, and there is evidence that the incident in the garage happened after A.W. turned fourteen.[4] First, the State notes that B.G. testified that A.W. was fourteen when the incident in the garage occurred. Second, there was evidence that B.G. and A.W. both told police officers that the garage incident occurred in October 2010, when A.W. was fourteen. Third, although A.W. originally testified that the garage incident happened

---

[4] While we ultimately agree with the State's argument, we caution the State to take more care in citing the record. In its argument on issues I and II, the State frequently uses string citations to several pages of the record, some of which support the State's arguments and some of which do not.

16

when she was thirteen, when she was confronted with her deposition testimony, she agreed that it happened after she returned home from California, which was after her fourteenth birthday.

Stewart counters by arguing that B.G.'s testimony was speculation because she did not know A.W.'s birthdate and that the testimony from the officers was impeachment evidence that may not be used as substantive proof. However, he offers no reason why the jury could not have relied on A.W.'s own testimony that the garage incident occurred after she returned from California. We acknowledge that A.W.'s testimony concerning dates was highly inconsistent; however, it is the province of the jury to weigh the evidence and resolve inconsistencies. *See Johnson v. State*, 671 N.E.2d 1203, 1209 (Ind. Ct. App. 1996) (it is the jury's province to resolve any inconsistencies in the evidence), *trans. denied* (1997). The jury could have relied on A.W.'s testimony that the garage incident occurred after she returned from California and that the basement incidents occurred after the garage incident and therefore found that all three occurred in Indiana after A.W. turned fourteen.

Moreover, we presume that the jury follows the trial court's instructions. *Morgan v. State*, 903 N.E.2d 1010, 1019 (Ind. Ct. App. 2009), *trans. denied*. The court's instructions on each offense informed the jury that the State had to prove beyond a reasonable doubt that the offense occurred in Lake County, Indiana. We also note that during closing arguments, the prosecutor also told the jury not to consider the incidents that occurred in Illinois. Therefore, we conclude that the trial court did not abuse its discretion by denying Stewart's motion to dismiss and motion to correct error and that the evidence is sufficient to support the

17

convictions on counts III and V.

### III.  Counts I and II

Stewart argues that counts I and II both relate to the incident in the garage and because the jury acquitted him of count I and the same evidence was presented to support count II, collateral estoppel precludes a conviction on count II.  Our supreme court has stated:

> Collateral estoppel is not the same as double jeopardy, but rather it is embodied within the protection against double jeopardy.  "'[T]he traditional bar of jeopardy prohibits the prosecution of the crime itself, whereas collateral estoppel, in a more modest fashion, simply forbids the government from relitigating certain facts in order to establish the fact of the crime.'"  *Little v. State*, 501 N.E.2d 412, 414 (Ind. 1986) (quoting *United States v. Mock*, 604 F.2d 341, 343-44 (5th Cir. 1979)).  In essence the doctrine of collateral estoppel "precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial."  *Yeager v. United States*, ⸺ U.S. ⸺, ⸺, 129 S. Ct. 2360, 2366, 174 L. Ed. 2d 78 (2009).  To decipher what a jury necessarily decided in a prior trial, courts should "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."  *Id.* at 2367 (quoting *Ashe* [*v. Swenson*, 397 U.S. 436, 444, 90 S. Ct. 1189, 1194 (1970)]).

*Coleman v. State*, 946 N.E.2d 1160, 1165 (Ind. 2011).

Stewart cites no cases in which collateral estoppel has been applied to two verdicts rendered at the same time in the same proceeding as opposed to a subsequent proceeding.  To apply collateral estoppel in this case would essentially nullify *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010), in which our supreme court held that inconsistency of verdicts is not a basis for reversing a conviction.  We are bound by supreme court precedent.  *Rexroat v. State*, 966 N.E.2d 165, 171 (Ind. Ct. App. 2012), *trans. denied*.

Even assuming that the doctrine of collateral estoppel can apply to verdicts rendered in the same trial, Stewart has not persuaded us that the acquittal on count I would preclude a guilty verdict on count II. First, we note that any of the three incidents that occurred in Indiana potentially could have supported count I, depending on how the jury resolved the factual issues concerning A.W.'s age. As discussed above, the jury could have found that all three incidents occurred when she was fourteen, and the jury could have acquitted him of count I on that basis. By contrast, B.G.'s age was not at issue. Count I was alleged to have occurred between April 1, 2010, and August 18, 2010, when A.W. was thirteen, while count II was alleged to have occurred between July 1, 2010, and October 31, 2010, which included all the possible dates that were proffered for the garage incident. Further, Stewart's argument assumes that the jury had to believe that either both girls performed oral sex in the garage or neither of them did. However, a jury may credit some aspects of a witness's testimony and not others. *Lampitok v. State*, 817 N.E.2d 630, 642 (Ind. Ct. App. 2004), *trans. denied* (2005). There is nothing that the jury "necessarily decided" in returning a not guilty verdict on count I that would preclude a guilty verdict on count II.

## IV. *Newly Discovered Evidence*

The denial of a motion to correct error based on newly discovered evidence is reviewed for an abuse of discretion. *Martinez v. State*, 917 N.E.2d 1242, 1247 (Ind. Ct. App. 2009), *trans. denied* (2010). Therefore, we will reverse only if the judgment is against the logic and effect of the facts or if the trial court misinterpreted the law. *Id*. The trial court's decision is given substantial deference. *Id*.

"A recantation or admission of perjury does not necessarily mandate the grant of a new trial." *Id*. (citing *Strain v. State*, 560 N.E.2d 1272, 1274 (Ind. Ct. App. 1990)). Instead, there is a nine-part test for determining whether to grant a new trial based on newly discovered evidence:

> A motion to correct error based upon the ground of newly discovered evidence must be supported by one or more affidavits which must contain a statement of the facts showing (1) that the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced upon a retrial of the case; and (9) that it will probably produce a different result. In ruling whether a piece of evidence would produce a different result, the judge may properly consider the weight that a reasonable trier of fact would give it and, while so doing, may also evaluate its probable impact on a new trial of the case.

*Wilson v. State*, 677 N.E.2d 586, 588 (Ind. Ct. App. 1997) (quoting *Fox v. State*, 568 N.E.2d 1006, 1007 (Ind. 1991)). "The defendant bears the burden of showing that the newly discovered evidence meets the standard for a new trial." *Martinez*, 917 N.E.2d at 1247.

The trial court denied Stewart's motion on the basis that the newly discovered evidence was merely impeaching, was not worthy of credit, and would probably not produce a different result.[5] It is apparent from the trial court's statements that it was not convinced

---

[5] The State argues that, due to the discrepancy in the notary's stamp, JeanPaul's affidavit consisted of unsworn statements and therefore is not worthy of credit. The trial court assumed, arguendo, that the discrepancy was a scrivener's error. We will do so as well, especially as there is no indication that JeanPaul was aware of the discrepancy or that his statement may not have been validly sworn.

We also decline to consider the State's argument that the newly discovered evidence was merely cumulative of other impeachment evidence. In support, the State cites over eighty pages of the transcript, which includes all of A.W.'s testimony on cross-examination, redirect, and jury questions, as well as the entirety of the defense's closing argument. We think it plain that not nearly all of this material supports the State's argument, and we will not search the record for evidence that might validly be considered cumulative.

that A.W. had in fact recanted. A.W. and Racquel both told police that A.W. was facing constant pressure from Gabrielle to recant, so much so that she attempted suicide. They also both stated that Gabrielle was using the fact that her children would grow up without a father to manipulate A.W., who had lost her biological father at a young age. A.W. was under the impression that Gabrielle had spoken to JeanPaul and persuaded him to help her pressure A.W. to recant. Evidence had also been elicited at trial that the family was less than supportive of A.W. and B.G. Reed testified that A.W. told him that she did not come forward with her allegations sooner because she was afraid that "it would start drama with the family which it did." Tr. at 179. A.W. testified that she had previously told Gabrielle what had happened, but Gabrielle did not believe her; she was "just all for Brandon [Stewart]." *Id*. at 152. Gabrielle confirmed that in January 2011, A.W. had told her what had happened. B.G. testified that she had told Racquel that "something was up" with her, A.W., and Stewart, but she got the impression that Racquel did not believe her. *Id*. at 80. Detective Matonovich testified that he attempted to talk to Cara, her husband, and her mother during his investigation, but none of them were willing to do so.

Stewart argues that the police report was hearsay and should not have been considered by the trial court; however, he did not object to its use at the hearing. Therefore, he has waived any argument that it may not be considered. *See Orr v. State*, 968 N.E.2d 858, 860 (Ind. Ct. App. 2012) ("When a defendant fails to make a contemporaneous objection to the admission of evidence at trial … any error is generally waived for purposes of appeal."). To the extent that he is arguing that the report is not worthy of credit, we note that his attorney

did not attempt to speak to A.W. about JeanPaul's claim that she had recanted or have her testify at the hearing. In response to the trial court's question as to why A.W. was not being called to testify, Stewart's counsel stated that "there's been a lot of contention" within the family and "[c]ertain people have been threatened based on [JeanPaul's] affidavit." Sentencing Tr. at 15. These vague assertions do not show that it was impractical or impossible to make arrangements to get a statement from A.W. or have her testify at the hearing. There was ample evidence from which the trial court could conclude that JeanPaul's affidavit was not worthy of credit and therefore would probably not produce a different result. *See Strain*, 560 N.E.2d at 1274 (rejecting newly discovered evidence claim based on child victim's recantation in part because evidence showed she had been pressured by family to recant). The denial of Stewart's motion for a new trial on grounds of newly discovered evidence was within the trial court's discretion.

## V. *Appropriateness of Sentence*

Indiana Appellate Rule 7(B) states, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Purvis v. State*, 829 N.E.2d 572, 588 (Ind. Ct. App. 2005) (internal citation and quotation marks omitted), *trans. denied*, *cert. denied* (2006). The defendant

bears the burden of persuading the appellate court that the sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

The trial court imposed a sentence of thirty-three years on count II, thirteen years on count III, five years on count IV, and five years on count V. The court determined that the sentences for counts II and IV (the offenses against B.G.) should be served consecutive to the sentences for counts III and V (the offenses against A.W.), for an aggregate sentence of forty-six years. The court felt that the consecutive sentences were warranted because there were two victims. "It is a well established principle that the fact of multiple crimes or victims constitutes a valid aggravating circumstance that a trial court may consider in imposing consecutive or enhanced sentences." *O'Connell v. State*, 742 N.E.2d 943, 952 (Ind. 2001). Indeed, Stewart does not request concurrent sentences, but argues that his sentences on counts II and III should be reduced to the minimum. For count II, a class A felony, the sentencing range is twenty to fifty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4. For count III, a class B felony, the sentencing range is six to twenty years, with an advisory sentence of ten years. Ind. Code § 35-50-2-5.

As to his character, Stewart notes that he had no prior criminal record and had been gainfully employed and supporting his family, who would face hardship during his incarceration. As to the nature of the offenses, Stewart argues that the evidence does not show that his offenses were "any more egregious than any other child molesting or sexual misconduct with a minor." Appellant's Br. at 18. We disagree. First, as noted by the trial court, Stewart took advantage of the girls' trust and their familiarity with them. Second, the

trial court found that the incident in the garage was "very troubling," Sentencing Tr. at 56, and we agree. In order to avoid getting caught, Stewart had the girls take turns keeping a lookout while he had the other perform oral sex. Stewart ejaculated into B.G.'s mouth, which she described as "slimy and gross," and then he used his tongue to remove it from her mouth. Tr. at 50. B.G. also testified that Stewart left them two cigarettes as he exited the garage. Giving cigarettes to two young girls would be inappropriate in any case, but in these circumstances the gesture suggested that what had happened was no big deal and could be paid for easily. The events that unfolded as a result of Stewart's conduct drove a wedge between family members and put so much pressure on A.W. that she attempted suicide. In light of the nature of the offenses, Stewart has not persuaded us that sentences slightly above the advisory are inappropriate. Therefore, we affirm.

Affirmed.

BARNES, J., and PYLE, J., concur.